CHESAPEAKE & OHIO RAILWAY COMPANY *v.* GROVER C. ALLEN et al.

(No. 7401)

Submitted May 11, 1933.    Decided May 30, 1933.

692

*Fitzjatrick, Brown & Davis* and *McDaniel Purcell*, for plaintiff in error.

*Maxwell, Sayre & Bowers*, for defendants in error.

HATCHER, JUDGE:

This is a review of the second judgment obtained by Grover Allen in a condemnation proceeding brought against him by the Chesapeake & Ohio Railway Company. Our opinion on the first judgment is reported in 111 W. Va. 481.

Allen owns 43 acres of land adjacent to the Big Bend tunnel of the railroad. He paid $400.00 for 14 acres in 1926, and $2,000.00 for the balance (29 acres) in 1930. The latter tract had improvements when he acquired it which he values at $1,500.00; so the 43 acres exclusive of improvements cost him $900.00 (about $21.00 an acre). The 43 acres is valuable for farming and was said to be marketable if cut into small farms. Allen built a stone residence on this tract several years ago. The residence was located about 80 feet from the C. & O. right of way as it then existed. In this proceeding, the railway company has condemned a strip of 0.653 acres, situate between its former right of way and the residence. The strip embraces the greater part of Allen's back yard, extending to within seven feet of his back porch. During the progress of this litigation another tunnel has been constructed through the strip, 138 feet below the surface. There was no subsidence of the surface. Upon the second trial, the jury returned a verdict for Allen of $8,500.00, which the circuit court con-

firmed. The railway company was awarded a writ of error.

The market value of the strip taken was fixed at $200.00 an acre—only one witness testifying thereto. R. C. Haynes, a witness for Allen, was explicit that the residue of the farm—excluding the residence—was worth $150.00 an acre before the strip was taken and was worth the same afterwards. No witness testified that the residue (excluding the residence) was injured for farming or for small farm sales in any way by the taking of the strip. Since the strip is along an exterior boundary line, it is not apparent how the residue of the land itself could be affected by the taking. The enormous appreciation in the value of the land during the present business depression, over its purchase price, is not explained or is it important. The verdict ($8,500.00) presumably consists of only two items, $130.60 ($200.00 an acre multiplied by 0.653 acres) for the strip and $8,369.40 (the balance of the verdict) for damages to the residence. Allen would sustain that balance by the evidence of himself and three other witnesses, Haynes, B. Z. Carden and Harrison Lawrence.

Allen said he had acquired a knowledge of the market value of property in the neighborhood from sales made by his neighbors, and was of opinion that the fair market value of his land on June 16, 1931, the date when the strip was taken, was $17,000.00, and immediately afterwards the value was $7,000.00. He testified that the blasting in the tunnel "cracked the walls in my house both plaster and the outside, the stone walls." He did not describe the number or the dimensions of the cracks but said "the damage" took away "the entire value of my house". He qualified that assertion by saying "the damage * * * destroyed the sale value" of the house. (At the former trial he stated that he had made no effort to sell it.) He admitted the plaster had cracked some before the tunnel was commenced and has continued to crack since the tunnel was completed; that he was still living in the residence; and that the only present ill effect from the cracks was leakage of some water into the basement.

Haynes was of opinion the market value of the residence before the taking was nine or ten thousand dollars, though he did not claim to know "just exactly the value of the house", and thought perhaps it was damaged about $4,500.00.

Garden owned a tract near Allen and had sold some real estate in Allen's neighborhood. He was of opinion that the fair market value of Allen's property before the taking was $16,000.00 and afterwards was $9,000.00. He made no specific reference to the residence.

Lawrence is an experienced building contractor. He made a careful examination of the residence and estimated its reconstruction cost, new, at $9,235.42. He was not questioned as to the present condition of the house or as to repairing it.

The following evidence on behalf of defendant was not controverted. C. B. Porter, defendant's resident engineer with long observation of stone work, was of opinion that the cracks in the walls (being in the mortar) did not weaken them to any extent and that it would be "a long time" before the walls would suffer any from the effects of water entering the cracks. W. E. Meador, a contractor and builder of long experience, was of opinion that the cracks in the plaster came from improper construction, saying: "* * * the joists are too light and not sufficient to hold up the partitions. The joists in it (the house) are fifteen feet long and only two by eight and put eighteen inches on centers. I could never build a house out of that kind of joists and hold my plaster." He further said that the cracks both in the plaster and in the walls could be repaired so that the house would be as good *as it ever was* at a cost of about $250.00.

Counsel for Allen contends that the jury must have disbelieved Meador. If so, the disbelief was seemingly arbitrary. Faulty construction of the house is definitely established by Allen's own admission that cracks appeared in the house before the blasting commenced and have continued to come since the blasting ceased. Allen's own witness Lawrence, concurred in Meador's opinion of the joists, saying they were "light". Moreover, Lawrence was in position, because of his thorough examination of the house, to have controverted Meador's estimate of the cost of repairs had it been too low. Allen's failure to question Lawrence on that subject *weighs heavily against him*. We are impressed that Allen did not care to develop the damage from blasting except superficially. His indifference thereto may be explained in two ways. First, the entire damage from the cracks amounted to but $250.00

(according to the unchallenged estimate of Meador) and only part of that estimate can be attributed to the blasting. Second, on the former trial and before the house suffered any at all from the blasting, Allen claimed that *the mere taking of the strip* damaged the residue of his property $10,000. *He claimed then* the precise amount of damage which *he claims now*. His main contention then and now is that *the taking of his back yard completely ruined the market value of his residence*. Having built his residence to live in, he does not want to sell it—he so stated at the former trial. If he can recover now practically what the house cost him and yet continue to live comfortably in it, he will be *eating his cake and having it too*—a feat not sanctioned at law. It is not fair to charge the entire repair bill for the cracks to the railway company. But if we did so, and deducted the entire estimate of $250.00 from the residue damage of $8,369.40 in the verdict, there would remain $8,119.40 awarded for depreciation in value of the house occasioned by the taking of the back yard.

We take judicial notice that not every back yard appreciates the value of the residence. The quality and the use made of Allen's back yard do not appear in the record. The only actual deprivation referred to in his brief is that "he can't drive a farm vehicle around his house without trespassing upon the railroad company". The record shows that the back yard was not convenient, much less necessary, as a driveway. Whatever the use Allen made of the back yard, there is no evidence that a side yard or some other land near the residence cannot be subjected to the same use. A back yard should add to the utility of a residence, but is not a necessity. There are thousands of houses in cities and towns which never have any more back yards than the seven foot section remaining to the Allen residence. The sale value of such houses is not *destroyed* because of restricted yard area. We cannot conceive that a house comparatively new, like Allen's, which would cost $9,235.42, should at once depreciate in market value to only $1,116.02 ($9,235.42 less $8,119.40) if its back yard was reduced to seven feet in width. Yet that is what the verdict of the jury would imply. At that rate of depreciation, further reduction of yard area would reduce the status of the residence to a liability instead of an asset, a *reductio ad absurdum*.

Allen's brief further says: "The railway company has a right within the very eaves of the house to put any sort of use it wants to upon the land taken in this case." The assertion is somewhat figurative but otherwise correct. While a use of the strip by the company which would injure the value and the comfort of Allen's residence is possible, the fact that the activities of the company are confined to its tunnel 138 feet underground makes such a use improbable. We are not saying that the mere possibility of an injurious use is not to be considered by the jury. We do not say that the taking of the back yard does not substantially affect the sales value of the residence, or that the blasting may not have done it material damage. We do say, however, that owing to the particular circumstances of this case it should have been approached in a common sense way, and evidence of practical rather than fanciful damages submitted. In contending against the admissibility of some of the evidence offered by the railway company, Allen's brief invokes the rule that a litigant is required to furnish the *best evidence* available. Under that rule, Allen himself should have submitted to the jury substantial evidence of his extreme loss rather than a mere *ipse dixit*. The brief also asserts in regard to proof of Allen's damages: "The usual test breaks down in such case." We agree that the usual test, conjecture of lump sum value before and lump sum value after the strip was taken—unaccompanied by practical details—is inconclusive on this record. For all which, we are of opinion that the evidence of Allen is not of sufficient substance to support the *quantum* of the verdict.

The jury viewed the premises in question. We are aware that this Court usually accords especial weight to verdicts in such cases. We cannot assume that the jury consisted of experienced contractors or competent real estate salesmen. Besides, the jury is not a mere enlarged set of commissioners who may rely on their own notions entirely. The very appeal from the award of the commissioners is for the purpose of having the case tried according to the law and the evidence of witnesses, and under the supervision of the court. The statute does not contemplate converting the jurors into "silent witnesses", who, in the absence of substantial evidence, may supply the same from their own impressions and deductions,

the accuracy of which is not tested by cross-examination and the relevancy of which is not approved by the court. The object of the jury view is "to acquaint the jury with the situation of the premises and the location of the property, so that *they may better understand the evidence and apply it to the local surroundings of the case." Fox* v. *Rr. Co.*, 34 W. Va. 466, 479-480, 12 S. E. 757, 762. They may properly consider what they observe which is ancillary to the record evidence. *State* v. *McCausland,* 82 W. Va. 525, 96 S. E. 938. But their view is not for the purpose of providing essential evidence *dehors* the record. "If the rule were otherwise," said the Supreme Court of California in *Wright* v. *Carpenter,* 49 Cal. 607, 610, "the jury might base its verdict wholly on its own inspection of the premises, regardless of an overwhelming weight of evidence to the contrary, and the losing party would be without a remedy by motion for a new trial."

We are not unmindful of the legal generalizations which favor upholding the verdict. We are reluctant to disturb the verdicts of juries. But reluctance must yield to duty whenever the record affords no substantial evidence to support *the quantum* of the verdict, as in this case. Judge Thompson made the following declaration as one which could "be safely stated": "Courts of error or appeal will set aside a verdict in every case, where the record discloses that there was no substantial evidence to support it." Thompson on Trials (2d Ed.), sec. 2273. We can say here, as did the Supreme Court of Indiana in the case of *The Pittsburgh etc. Ry.* v. *Morton,* 61 Ind. 539, 583-4: "Upon the whole record it seems plain that substantial justice has not been done between the parties. An affirmance of the judgment we think, would approve a judicial wrong, while a reversal denies no right to either party, but simply requires a new trial according to the law of the case and the facts proved."

Error is accredited to several rulings of the trial court on evidence and instructions. But we perceive nothing therein prejudicial to the railway company.

The judgment of the lower court is reversed, the verdict set aside, and a new trial awarded the railway company.

*Reversed; verdict set aside; new trial awarded.*