David O. Boehm, J.
This action was brought by the plaintiff to recover compensatory and punitive damages pursuant to the Federal Fair Credit Reporting Act (US Code, tit 15, § 1681 et seq.) against the defendant, a credit reporting agency, and a jury trial has been held. The sole defendant is Rochester Credit Center, Inc. The other two defendants, by stipulation of counsel before the trial commenced, were merged into Rochester Credit Center, Inc.
The Federal Fair Credit Reporting Act, hereinafter referred to as Act, was enacted by Congress "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for customer credit, personnel, insurance and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.” (US Code, tit 15, § 1681, subd [b].)
Section 1681 n of the Act provides civil liability for willful noncompliance by a credit reporting agency with any of the requirements imposed by the Act in an amount equal to: "(1) Any actual damages sustained by the consumer as a result of the failure; (2) Such amount of punitive damages as the court may allow; and (3) In the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney’s fees as determined by the court.”
*279 The Act permits an action to be brought in any court of competent jurisdiction as well as in the Federal court.
During the course of the trial the plaintiffs action for compensatory damages was dismissed. The jury returned a special verdict finding that the defendant failed to comply with the requirements of the Act and that such noncompliance was willful.
The special verdict was abundantly supported by the proof and the findings of the jury have been accepted by the court. The defendant’s request that the court view the jury’s findings as advisory only was denied as was the defendant’s motion to set aside the special verdict and for judgment notwithstanding the verdict.
Because the allowance of punitive damages and reasonable attorney’s fees rest solely with the court, these matters remain for determination.
In connection therewith, the court has heard extensive argument, counsel have submitted comprehensive memoranda of law and the court has conducted its own independent research. In addition, after the verdict, a hearing into the financial condition of the defendant was conducted pursuant to Rupert v Sellers (48 AD2d 265), for the purpose of considering the income and net worth of the defendant on the question of the amount of the punitive damages. Since this case appears to be one of first impression, at least insofar as any reported decisions in New York, a greater discussion is warranted of the principles involved and the issues raised by the defendant than might otherwise be called for.
I. PUNITIVE DAMAGES
The purpose of punitive damages is not only to punish the wrongdoer and furnish an example to deter him from a repetition of the wrongful act but also to serve as a warning to others (Rupert v Sellers, 48 AD2d 265, supra). They "are awarded upon public consideration as a punishment of the defendant for the wrong in the particular case, and for the protection of the public against similar acts” (14 NY Jur, Damages, § 176, p 36).
Ordinarily, there is no formula by which punitive damages may be fixed and the Act does not provide one. There is a civil penalty of up to $5,000 in subdivision (1) of section 45 of the Federal Trade Commission Act (US Code, tit 15, § 45, subd [1]) *280 which, as to administrative enforcement, is incorporated by reference in subdivision (a) of section 1681 s of the Act.
In New York, the Credit Data Reporting Act (General Business Law, § 370 et seq., § 376) permits exemplary damages in a civil action of not less than $100 nor more than $1,000 for each violation.
However, we are here dealing neither with a fine which may be exacted by the Federal Trade Commission nor with the violation of a New York statute, but with a law in which Congress deliberately left to the court’s discretion the amount of punitive damages which should be imposed in a particular case. Other penalties and provisions in other laws should not be used as a substitute for that discretion. As a matter of fact, Congress expressly rejected a proposal to hamper thati discretion by placing a ceiling on the amount of punitive damages which could be awarded (see US Code Cong Adm News, 1970 pp 4414, 4416).
Nor did Congress tie the awarding of punitive damages to a recovery for compensatory damages. Thus the argument of the defendant that they are necessarily interdependent and that the size of any award for punitive damages depends upon the amount awarded as compensatory damages is without substance.
There is no such general rule in any event. In Reynolds v Pegler (123 F Supp 36, affd 223 F2d 429, cert den 350 US 846) an award of punitive damages of $175,000 was sustained where only $1 of compensatory damages was awarded. As the Court of Appeals pointed out in Toomey v Farley (2 NY2d 71), punitive damages need bear no ratio to compensatory damages and, in Clark v Variety, Inc. (189 App Div 462), it was held that punitive damages may be awarded even if there are no compensatory damages (see, also, Goldwater v Ginzburg, 414 F2d 324, cert den 396 US 1049; Wills v Trans World Airlines, 200 F Supp 360).
Defendant further argues that punitive damages may not be awarded in the absence of a showing of malice or evil motive. This may be the usual common-law rule, but that rule has no application to the Act, where the awarding of punitive damages is not based upon the common law but upon a statutory requirement of willful noncompliance, nothing else.
I will not here review the record which, as stated, supports the jury’s finding of willful noncompliance. Suffice it to say *281 that the jury found that the defendant’s acts were not accidental, that they were not innocent, that they were not unintentional; but rather, that they were deliberate and purposeful, that they were the routine method of conducting its business and that they were in complete disregard of the clear requirements of the law. The noncompliance of the defendant was willful in the full legal sense of that word.
For the defendant to argue otherwise at this juncture is to disregard the fact that its application to set aside the jury’s findings has already been denied.
In determining the proper amount of punitive damages to be assessed, the court must consider a variety of things: the remedial purpose of the Act, the harm to consumers intended to be avoided or corrected thereby, the manner in which the defendant conducted its business and dealt with the plaintiff, as well as the defendant’s income and net worth.
By its own admission, the defendant has been operating under a system which does not include independent verification of outstanding judgments or unsatisfied mortgages or liens. As an example, one judgment continued to be reported on the plaintiff’s credit report after the Statute of Limitations had expired. Mortgages were repeatedly listed as being outstanding in 1971 and 1972 which had been discharged as early as 1966. One of these discharged mortgages was repeatedly and incorrectly listed, in spite of the fact that the plaintiff constantly called that error to the attention of the defendant, as an open delinquent credit transaction. Other examples of defendant’s disregard of the plaintiff’s rights under the Act could be cited.
The defendant makes out over 50,000 credit reports a month, of which only 2% are authenticated as accurate or up to date as of the date of mailing. Consequently, the defendant’s credit report of the plaintiff repeatedly conveyed the same incorrect, obsolete information to credit institutions in the area in what the jury must have viewed as a calculated disregard of the plaintiff’s many efforts to have his report corrected.
Time and again plaintiff came to the defendant’s office and went over the same credit information with the defendant’s employees, pointing out the errors, all to no purpose. Time and again he tried to have the defendant update and correct its report of him; he pleaded, he lost his temper, all to no avail. Like a character in Kafka, he was totally powerless to *282 move or penetrate the implacable presence brooding, like some stone moloch, within the castle.
It was this very kind of contumacious conduct that Congress sought to correct. It recognized that to do so, it might be necessary to cause and, if need be, to coerce a change in the defendant’s operations in order to make it comply with the law. Congress intended to make it expensive for the defendant not to comply. This was the purpose of assessing, without limitation, punitive damages. As one commentator has observed, "Deterrent awards should be large enough to remove any financial incentive to violate the statute.” (Comment, Punitive Damages Under Federal Statutes: A Functional Analysis, 60 Cal L Rev 191, 223.)
Plaintiff still has outstanding two pending causes of action for libel and slander in which compensatory and punitive damages are also sought. These actions were severed from this one by agreement between the parties before the trial. If the plaintiff succeeds in those actions, which arise out of the same transactions, any award made here of punitive damages may or may not be considered by the trial court. In those actions, the plaintiff may obtain a compensatory award for the damages to his business credit, something he could not recover in this trial because damages are limited under the Act to his individual credit. In such case an award for punitive damages would be based upon the common-law right to such damages where libel or slander is proven, rather than, as here, an award for a willful violation of the Act, which is a completely separate basis for such damages.
Accordingly, I do not agree that an award for punitive damages at this time would subject the defendant to "double exposure” for punitive damages in a later suit if it is successfully tried. At the very least, the availability of such damages is subject to the independent judgment of the trial court at that time. It does not operate as a bar to the awarding of punitive damages at this time.
II. REASONABLE ATTORNEY’S FEES
In determining the amount of reasonable attorney’s fees, the courts in awarding similar statutorily authorized fees, as in section 4 of the Clayton Act (US Code, tit 15, § 15), have brought to bear a combination of considerations, including those delineated in canon 12 of the Canons of Professional Ethics of the American Bar Association. But they have em *283 phasized that while the factors contained there furnish a helpful standard they do not provide a precise measure and, therefore, what is "reasonable” necessarily depends upon the particular case for which the fee is fixed (Noerr Motor Freight v Eastern R. R. Presidents Conference, 166 F Supp 163, aff273 F2d 218, revd on other grounds 365 US 127; Twentieth Century Fox Film Corp. v Goldwyn, 328 F2d 190, cert den 379 US 880).
As one court put it, the ultimate test to be applied must be what in the judgment of the trial court "it would be reasonable for counsel to charge a victorious plaintiff. The rate is the free market price, the figure which a willing, successful client would pay a willing, successful lawyer.” (Cape Cod Food Prods. v National Cranberry Assn., 119 F Supp 242, 244.)
The Noerr Motor Freight v Eastern R. R. Presidents Conference case (supra, p 169) also stands for the proposition that a court in determining attorney’s fees under section 4 of the Clayton Act should disregard any fee arrangement existing between a plaintiff and his lawyer and that any such arrangement is irrelevant in determining the amount of such a fee.
Accordingly, it is necessary to reject the argument of the defendant that the amount of the attorney’s fees which may be awarded by the court must not be in excess of the contingent fee arrangement between the plaintiff and his attorneys. Plaintiff had entered into a fee arrangement providing for counsel to receive 50% of the amount recovered.
Such an argument would require that the court’s judgment as to reasonable attorney’s fees be limited by exterior arrangements and overlooks the important purpose of Congress to award attorney’s fees on the theory that, in winning, the plaintiff had vindicated the remedial purpose of the legislation.
This Act, like the Clayton Act and the Truth in Lending Act (US Code, tit 15, § 1601 et seq., § 1640), among others, was enacted to enable private litigants to assist in the enforcement of the Congressional purposes and, at the same time, recover such damages as may have been inflicted upon them. The Federal purpose is to "create a species of 'private attorney general’ to participate prominently in enforcement.” (Ratner v Chemical Bank N. Y. Trust Co., 329 F Supp 270, 280; see, also, Farmington Dowel Prods Co. v Forster Mfg. Co., 421 F2d 61, 66; Hutchinson v William C. Barry, Inc., 50 F Supp 292, 298.)
Thus in one case involving the awarding of attorney’s fees *284 under the Fair Labor Standards Act (US Code, tit 29, § 201 et seq.), an attorney was awarded attorney’s fees of $400 for obtaining a wage recovery of only $375.10 (Koerner v Associated Linen Laundry Suppliers, 270 App Div 986).
In Farmington Dowel Prods Co. v Forster Mfg. Co. (297 F Supp 924, 421 F2d 61, supra) the lower court took the position that a "fees awarded” arrangement, i.e., the fee awarded by the court as reasonable, could not be made where the plaintiff and his counsel had entered into a contract providing that the attorneys would get one third of the recovery, plus all of the amount awarded as "reasonable attorney’s fees”. It held that all the attorney was entitled to receive was the one-third amount contracted for, although recognizing that its ruling would give the defendant an undeserved windfall of the amount which it would otherwise have had to pay as reasonable attorney’s fees. No statutory fees were therefore awarded.
The Court of Appeals disagreed. Although conceding that courts possess the power to modify excessive fee arrangements and concern themselves with what a plaintiff has bound himself to pay his attorney, it held this does not preclude the court from awarding the reasonable fees provided for by law in addition to the contingent fee privately contracted for between client and counsel so long as the court is satisfied that counsel would not thereby obtain an excessive fee. The court pointed out that there are some important differences between a determination of reasonableness according to canon 12 standards and the reasonable fee provided for by statute, which "contemplates an estimate of reasonableness from the perspective of one looking back over the litigation” (421 F2d 61, 89, supra).
The District Court had reasoned that a "fees awarded” arrangement is contrary to the, language of section 4 of the Clayton Act, similar to section 1681 n of the Fair Credit Reporting Act, because the statutory language made clear Congress’ intent that such attorney’s fees be part of plaintiff’s recovery and awarding reasonable attorney’s fees under the circumstances would not reimburse the plaintiff because the fees would go to counsel.
In reversing, the Court of Appeals said (p 88): "That argument proves far too much. It would say that treble damages could not be properly awarded if counsel has a contingent fee arrangement — say, one third — because one third of such damages 'would not reimburse plaintiff in any sense, since it *285 would accrue entirely to counsel.’ Carried one step further, it would say that any part of the award under section 4 will not be awarded if the plaintiff is bound to pay his attorney out of it. We cannot accept that conclusion, which would leave private antitrust enforcement to the independently wealthy. It seems clear to us that in the 'fees awarded’ arrangement, the contingent fee arrangement, and any other fee arrangement the court’s award goes first to the plaintiff as part of his recovery in accordance with the language of section 4. If he chooses to pass that money on to his attorneys, that is his business.”
Thus, agreement between plaintiff and his counsel as to compensation is "wholly immaterial to the issue before the court” as to what should be set as a reasonable attorney’s fee (Milwaukee Towne Corp. v Loew’s, 190 F2d 561, 570). Any such agreement is neither binding upon the court nor determinative of the question as to the amount to be awarded.
If there were any lingering doubt of this, it would be dispelled by the clear, emphatic language in Farmington Dowel Prods, (supra, p 90): "We believe that section 4 not only contemplates recovery of a reasonable attorney’s fee by a successful plaintiff but also payment of that fee by a losing defendant as a part of his penalty for having violated the antitrust laws. We cannot believe that the imposition of this penalty was meant to turn in any way on the nature or amount of the plaintiffs fee arrangement, a fortuity wholly unrelated to defendant’s illegal conduct.”
III. AWARDS
In a reported case brought under this Act, a consumer had no lost wages or medical expenses as a result of the willful violation of the Act by a consumer reporting agency but was found to have suffered mental anguish, had symptoms of sleeplessness and nervousness and many times had to leave his employment in order to meet with the agency as a result of its refusal to disclose information. It was also found that the agency gathered personal information about the consumer only from four neighbors, did not verify the information and falsely reported that all of the neighbors were in agreement as to certain information when it was obtained from only one neighbor. The court awarded $2,500 as compensatory damages, $25,000 as punitive damages and $12,500 for attorney’s *286 fees, plus costs (Millstone v O’Hanlon Reports, 383 F Supp 269).
After considering all of the elements that should go into making an award of punitive damages in this case, including the defendant’s income and net worth, the court awards plaintiff the sum of $10,000 for punitive damages.
There were three different lawyers for the plaintiff, including the attorney of record who conducted the trial and all of the events subsequent to it. There is no question but that they expended a considerable amount of time in the preparation of this case, some of it required because of the attitude of the defendant, which was as intractable after the suit was begun as it had been before. The attorneys testified to a total of 287.5 hours. However, one of the attorneys candidly admitted that he was unable to substantiate the 100 hours of time testified to since his written time records totalled only 60 hours, of which 10% was spent on the business libel action not here involved.
Plaintiff’s third lawyers, the present attorneys of record, proved 190.5 billable hours, of which 170.5 were spent on this action under the Fair Credit Reporting Act and the balance on the business libel action.
Plaintiff’s first attorney entered into the 50% contingency arrangement with the plaintiff. The second and third attorneys adopted such retainer agreement and of course, with respect to any contingent fee, would be equally bound by it (Reubenbaum v B. & H. Express, 6 AD2d 47, 49).
An award is made of $8,000 as reasonable attorney’s fees of all of the attorneys, to be pro rated as follows: 5% thereof to the first attorney; 25% thereof to the second attorney and 70% thereof to the present attorney of record.
Plaintiff may have judgment accordingly, together with costs and disbursements.