399 S.E.2d 694

**Billy J. JONES and Sandra L. Jones**

v.

**The CREDIT BUREAU OF HUNTINGTON, INC.**

**No. 19479.**

Supreme Court of Appeals of West Virginia.

Nov. 13, 1990.

Bruce A. Toney, Flynn, Max, Miller & Toney, Huntington, for Credit Bureau of Huntington.

James W. St. Clair, St. Clair & Levine, Huntington, for Billy J. Jones, Sandra L. Jones.

McHUGH, Justice:

This case is before the Court upon the appeal of the Credit Bureau of Huntington, Inc., the defendant below. The appellees are Billy J. Jones and Sandra L. Jones, the plaintiffs below. The appellant has asked this Court to review the final judgment of the Circuit Court of Cabell County. We affirm that judgment.

## I

The appellees own and operate a real estate appraisal business. The appellee, Billy Jones, is qualified as a real estate

appraiser and is licensed as a real estate broker in West Virginia and Ohio.

The appellant, Credit Bureau, is a consumer reporting agency. At the time the complaint was filed in this action, William P. Hall, Jr. was president and general manager of the appellant and Kimberly Jo Robertson was a full-time employee of the appellant.

Robertson began working for the appellant in September, 1980. She was trained to report credit items to the appellant for the purpose of compiling a report entitled the "Weekly Public Record Bulletin," which consists of items from public records in six different county clerk's offices.

The "Weekly Public Record Bulletin" is issued to approximately 275 customers of the appellant throughout fifteen counties in West Virginia, Kentucky and Ohio. These customers include businesses, individuals, attorneys, doctors, dentists, banks, and retail department stores. The appellant's customers utilize the information in the "Weekly Public Record Bulletin" to determine the credit worthiness of consumers before extending credit to such consumers.

The appellant's credit reporting services can also be instantly accessed by credit bureaus in all fifty states through a network called the "Transunion System." The "Transunion System" contains over 800,000 consumer files.

In March, 1987, Robertson's duties were expanded to include the reporting of judgment orders filed in county circuit clerk's offices, which would then be published in the "Weekly Public Record Bulletin." This duty involved obtaining the name of the prevailing party, the name of the party against whom the judgment was rendered, the amount of the judgment, and any pertinent information by which to identify the parties.

On September 9, 1987, Robertson inspected the civil order book in the circuit clerk's office in Cabell County, and, as a result of such inspection, reported to the appellant that a judgment order had been rendered in favor of Farmers Federal Savings & Loan Association against the appellees, in the amount of $20,000. This information was published by the appellant in the September 12, 1987 issue of the "Weekly Public Record Bulletin." This issue was then distributed to the appellant's customers, numbering approximately 275.

In reality, there was no such judgment rendered against the appellees. Rather, this information reported by Robertson was obtained from data concerning a deficiency judgment sought by Farmers Federal against the appellees on a foreclosure sale. The amount of the judgment was for $16,068.50, and the original note was for $20,000. A court ruling which denied Farmers Federal's motion for summary judgment was the information reported by Robertson and ultimately published by the appellant.

On September 14, 1987, three clients of the appellees' real estate appraisal business contacted the appellees, requesting information concerning the incorrectly published information in the "Weekly Public Record Bulletin."

The appellee, Billy Jones, notified William P. Hall, Jr., president and general manager of the appellant credit bureau, and the two, along with counsel for the appellee went to the courthouse to verify the accuracy of the information published by the appellant.

After concluding that the published information was, in fact, incorrect, the appellant placed a correction in the next issue of the "Weekly Public Record Bulletin," which was published on September 19, 1987.[1]

---

1. The correction by the appellant, which is included in the record of this case, was contained in an enclosed area whose perimeter consisted of a series of asterisks. The correction, in its entirety, stated:
    CORRECTION
    IN OUR SEPTEMBER 12, 1987 PUBLIC RECORDS BULLETIN, #4285, PAGE 3, UN-

DER THE HEADING JUDGMENTS RECORDED, WE PRINTED THE FOLLOWING ITEM:
FARMERS FEDERAL VS BILLY & SANDRA JONES $20,000.00 + COST
PLEASE BE ADVISED THAT THIS IS TOTALLY INCORRECT AND PRINTED IN ERROR AND SHOULD BE DELETED FROM ANY

The appellees subsequently instituted an action in circuit court under the Fair Credit Reporting Act (FCRA), a federal law, codified in 15 *U.S.C.* §§ 1681 to 1681t.[2] The case was tried by a jury and a verdict was returned in favor of the appellees for compensatory damages in the amount of $4000 and punitive damages in the amount of $42,500.

The appellant's motion to set aside, alter, or amend the damage awards was denied by the circuit court. This appeal ensued.

## II

On appeal, the Credit Bureau contends that the circuit court committed error by not setting aside, altering or amending: (1) the jury verdict of $4000 compensatory damages; and (2) the jury verdict of $42,-500 punitive damages. We address these assignments in order.[3]

## III

█ We first address the appellant's contention that the circuit court committed error by not setting aside the jury verdict of $4000 compensatory damages. Specifically, the appellant maintains that the jury's verdict in this regard is excessive and not supported by the evidence. We disagree.

The appellant cites several precedents of this Court holding that there must be some data established by proof from which the amount of loss suffered may be determined. For example, in *Ripley v. C.I. Whitten Transfer Co.*, 135 W.Va. 419, 63 S.E.2d 626 (1951), this Court, relying upon principles set forth in previous decisions, held:

> Actual existence of damages as well as the amount thereof must be disclosed with reasonable certainty. *Stone v. Gilbert*, 133 W.Va. 365, 56 S.E.2d 201, 205. There must be some data established by proof from which the amount of loss

suffered by the plaintiff may be determined. *Newman v. Robson & Prichard*, 86 W.Va. 681, 684, 104 S.E. 127. 'Where the record contains no substantial testimony in support of the *quantum* of a verdict, it will be set aside.' *Railway Co. v. Allen*, 113 W.Va. 691, 169 S.E. 610.

*Ripley*, 135 W.Va. at 423, 63 S.E.2d at 628.

However, the FCRA is a *federal* statutory enactment, and it has been held that because the remedies provided by the FCRA are of federal statutory nature, the question of any right to relief in the form of damages is not to be determined by state court decisions. *Thornton v. Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). *See also Ackerley v. Credit Bureau of Sheridan, Inc.*, 385 F.Supp. 658, 661 (D.Wyo.1974).

State courts have recognized the same. "[I]n a Fair Credit Reporting Act case local laws apply only to matters of practice and procedure while substantive rights created by the Act are controlled by federal law and not subject to fifty different rules of interpretation." *Credit Bureau of Pulaski County, Inc. v. LaVoie*, 627 S.W.2d 49, 52 (Ky.Ct.App.1982). *See also Emerson v. J.F. Shea Co.*, 76 Cal.App.3d 579, 589, 143 Cal.Rptr. 170, 176 (1978).

█ Accordingly, in a case involving the Fair Credit Reporting Act, 15 *U.S.C.* §§ 1681 to 1681t, federal law will control the substantive rights created by such Act while state law will control the procedural matters of the case.

Inasmuch as there are no issues concerning procedure in this case, our main focus is on how the federal cases have construed the FCRA as it relates to substantive rights created thereunder. Specifically, the critical issue is whether the awards of

---

RECORDS MADE AS A RESULT OF READING THIS ISSUE OF THE BULLETIN. WE APOLOGIZE FOR ANY INCONVENIENCE THIS MAY HAVE CAUSED.

**2.** The Fair Credit Reporting Act is discussed in the subsequent sections of this opinion.

**3.** We note that there is no contention of instructional or evidentiary error in this case. Rather, the sole issue presented by the appellant is whether the evidence in this case *supports* the verdicts.

damages are supported by the evidence. *See supra* note 3.

The FCRA was enacted in 1970. The purpose of the FCRA is

> to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 *U.S.C.* § 1681(b) (1988).

Consistent with this purpose, civil liability is imposed for willful noncompliance with the FCRA. 15 *U.S.C.* § 1681n (1988) provides:

> Any consumer reporting agency or user of information which willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
>
> (1) any actual damages sustained by the consumer as a result of the failure;
>
> (2) such amount of punitive damages as the court may allow; and
>
> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

*See* 15A Am.Jur.2d *Collection and Credit Agencies* § 60 (1976).[4]

Civil liability is also imposed for negligent noncompliance with the FCRA. 15 *U.S.C.* § 1681o (1988), like § 1681n (1988), provides for recovery of actual damages, but makes no provision for recovery of punitive damages. *See* 15A Am.Jur.2d *Collection and Credit Agencies* § 61 (1976); *see generally* annotation, *Construction and Application of Fair Credit Reporting Act,* 17 A.L.R.Fed. 675 (1973).

Upon a close examination of the federal cases, it is clear that there is no merit to the appellant's contention that the verdict of $4000 compensatory damages is not supported by the evidence. This action, brought by the appellees, is not an action based upon common-law principles of tort. Rather, the remedy sought by the appellees is an independent statutory remedy brought under the FCRA.

A specific dollar amount cannot always be placed upon the damages sustained by a plaintiff in an action under the FCRA, but this alone would not necessarily bar recovery. In this case, even if the verdict did not reflect compensation for the appellees' loss of business, another theory of recovery is that the verdict was intended to compensate the appellees for humiliation, emotional distress, and any injury to their reputation or credit rating.[5]

■ Under the FCRA, "[e]ven when there are no out-of-pocket expenses, humiliation and mental distress do constitute recoverable elements of damage under the Act." *Thompson v. San Antonio Retail Merchants Association,* 682 F.2d 509, 513 (5th Cir.1982). *See also Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834–35 (8th Cir.1976). *Cf. Russell v. Shelter Financial Services,* 604 F.Supp. 201, 203 (W.D.Mo.1984) ("[A]lthough he has not

---

**4.** The FCRA uses the term "actual damages." This term is "[s]ynonymous with 'compensatory damages[.]'" *Black's Law Dictionary* 390 (6th ed. 1990). The verdict in this case awarded the appellees "compensatory damages." Obviously, this award reflects "actual damages" under the FCRA. For purposes of this opinion, we use the terms synonymously as well.

**5.** This theory of recovery was considered by the circuit court, and, therefore, "Plaintiff's Instruction No. 2" was given. That instruction provided:

> The Court instructs the jury that if you find for the plaintiff[s] Billy J. Jones and Sandra L. Jones then in estimating their damages, you are entitled to consider not only their loss of business, if any, but also an amount sufficient to compensate them for their humiliation, emotional distress, injury to their reputation and credit rating, if any. All these elements of damages should be weighted by you under the proof in the case in arriving at an amount which you believe will fully and fairly compensate Billy J. Jones and Sandra L. Jones for the damages which they sustained as the result of the actions of the Credit Bureau of Huntington, Inc. in publishing inaccurate statements about their credit, if proven by a preponderance of the evidence.

shown any actual injury resulting from [defendant's] violation of the FCRA, plaintiff is entitled to nominal damages in the sum of one dollar and punitive damages in an amount to be determined by the jury.").

■ Therefore, it is not necessary that the appellees establish at trial a specific dollar amount which would match the amount of the verdict awarding them compensatory damages for their actual loss. The FCRA creates a federal statutory action, independent from a common-law action in tort, and the plaintiff need only prove that he or she sustained actual damages resulting from a willful or negligent failure to comply with the Act in order to recover such damages. The specific amount of the actual damages is to be determined by the trier of fact and this amount may include compensation for humiliation, emotional distress, injury to the plaintiff's reputation, and injury to the plaintiff's credit rating.[6]

The appellant also contends that even if the specific dollar amount of actual damages was proven, the verdict of $4000 is still excessive and not supported by the evidence. We do not agree.

The evidence presented by the appellees at trial focused on the lack of training that the appellant afforded its employee, Kimberly Robertson. The president of the appellant, William P. Hall, Jr., testified that Robertson was not given any written materials concerning what she was to do in the circuit clerk's office. Hall also testified that generally, the employees are instructed to take every precaution to ensure accuracy but as a practical matter, it would be impossible to check the thousands of items that are copied for the weekly report. Consequently, the appellant, as Hall testified, assumes that the information is accurate. Hall also testified that it would not be cost efficient to require a second person to check the information copied by the first person.

Similarly, Robertson testified to a lack of training, stating that when she began working for the appellant eight years earlier, she received two weeks of instruction from the woman whom she replaced, namely, Verba Smith. Robertson testified that Smith did not teach her anything about the circuit clerk's office and that when Robertson's duties were expanded in March, 1987, to include the reporting of judgment orders, no training nor written instructions were provided.

Robertson also testified that she did not read the entire file concerning the incorrectly reported judgment against the appellees and that she did not have to read everything in such files but just the "necessary information." Robertson also testified that her work is not checked by a second person and that the only situation in which her work would be verified is when a consumer disputes the report after it is published. Robertson's testimony also indicated that her supervisor rated her job performance as "excellent" even though her supervisor did not accompany Robertson to the circuit clerk's office to see first-hand what she was doing. Finally, Robertson testified that had she read the order which is at issue in this case, then she would have known that no such judgment against the appellees existed in this case.

The appellee, Billy Jones, testified that, in his opinion, the appellant's report has adversely affected his real estate appraisal business. Specifically, Jones cited a 52% reduction in appraisal assignments between September 12, 1987, the date of the published report, and the time of trial. Jones testified that he was concerned that readers of the incorrect report would draw the conclusion that the reported judgment was the result of a bad appraisal.

Sue Maynard, a vice president of Family Savings & Loan, testified on behalf of the appellees. Maynard testified that Jones was a regular appraiser for Family Savings & Loan for the purpose of extending loans to customers desiring to use real estate as

---

6. We recognize that in this case, the jury determined that the appellant's failure to comply with the FCRA was willful, pursuant to 15 U.S.C. § 1681n (1988), and not negligent, pursuant to 15 U.S.C. § 1681o (1988). However, because actual damages may be recovered under either provision, our holding, with respect to actual damages, applies to both provisions.

security. Maynard also testified that she regularly received the "Weekly Public Record Bulletin," and that if she knew that an appraiser had a judgment against him or her, then she could not employ the services of that appraiser. Accordingly, Maynard testified that she employed the services of other appraisers after the September 12, 1987 issue of the "Weekly Public Record Bulletin" was published and did not employ the services of the appellee Jones until after the appellant's correction was printed.

The appellant focuses on the appellees' testimony that no unkind remarks were made about them and that they were never denied credit as a result of the incorrectly reported judgment. Specifically, the appellee, Billy Jones, testified that no one ever *expressed* a concern over his ability as an appraiser and that although he had been denied credit, the published report had never been cited as the reason for such denial.

Similarly, the appellant points to the testimony of the appellee, Sandra Jones, that no unkind remarks had been made to her and that although she was humiliated by the report, she never sought medical attention for emotional distress. Sandra Jones also testified that a jewelry store denied her credit subsequent to publication of the appellant's report, but there is no testimony that the report was the reason for such denial.

■ Obviously, there was evidence to support the contentions of both the appellant and the appellee. It is a well-established principle of law that:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume

as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984); *accord*, syl. pt. 2, *Miami Coal Co. v. Hudson*, 175 W.Va. 153, 332 S.E.2d 114 (1985). *See also* syl. pt. 2, *Cox v. Galigher Motor Sales Co.*, 158 W.Va. 685, 213 S.E.2d 475 (1975); syl. pt. 2, *Yeager v. Stevenson*, 155 W.Va. 16, 180 S.E.2d 214 (1971); *Whittaker v. Pauley*, 154 W.Va. 1, 4, 173 S.E.2d 76, 78 (1970); syl. pt. 3, *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963).

The procedures for compliance with the FCRA are set forth in 15 *U.S.C.* § 1681e (1988), and subsection (b) therein provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures *to assure maximum possible accuracy* of the information concerning the individual about whom the report relates." (emphasis supplied) The jury in this case was correctly instructed on this point.[7]

It is clear that the jury, by its verdict, found that the appellant did not comply with the procedures of the FCRA in a way that would "assure maximum possible accuracy" in its reporting of information about the appellees.

Accordingly, the circuit court did not commit error by not setting aside the jury verdict of $4000 compensatory damages.

### IV

We now turn to the appellant's contention that the circuit court committed error by not setting aside the jury verdict of $42,500 punitive damages.

---

7. "Plaintiff's Instruction No. 1" provides, in relevant part:

The Congress of the United States concluded 'there is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and with respect for the consumer[']s right to privacy.'

After making this finding and statement of purpose, Congress determined that whenever a consumer reporting agency such as the Credit Bureau of Huntington, Inc. prepared a consumer report, it should follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

As pointed out in section III of this opinion, 15 *U.S.C.* § 1681n(2) (1988) provides for punitive damages for *willful* noncompliance with the FCRA in addition to actual damages provided in 15 *U.S.C.* § 1681n(1) (1988), but there is no such provision for *negligent* noncompliance under 15 *U.S.C.* § 1681o (1988).

The appellant maintains that the verdict's excessive nature is obvious in light of the fact that the award of punitive damages is over ten times higher than the award of compensatory damages. In support of its argument, the appellant cites this Court's holding in syllabus point 5 of *Spencer v. Steinbrecher,* 152 W.Va. 490, 164 S.E.2d 710 (1968): "Punitive or exemplary damages are damages which together with and in reasonable proportion to the amount of compensatory damages will punish the defendant and in the judgment of the jury be sufficient to deter others from engaging in like course of conduct." *But see* syl. pt. 2, *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982) (trier of fact, in assessing punitive damages, "should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances.").

However, we must again look to other courts, particularly federal courts and state courts that have interpreted the FCRA, to see how they have applied the provisions of the FCRA because it is a *federal* statutory remedy. Consequently, this Court's holding in *Spencer* is of no help to the appellant.

Our research reveals that most courts are in general accord that 15 *U.S.C.* § 1681n (1988) "does not speak in terms of requiring actual damages; rather, it refers to actual damages as only one portion of any award or relief that might be granted." *Ackerley v. Credit Bureau of Sheridan, Inc.,* 385 F.Supp. 658, 661 (D.Wyo.1974). Moreover, "the *general* federal rule is to allow punitive damages, if there is a basis in fact, without regard to the necessity of actual damages[.]" *Id.* (emphasis supplied). *See* 15A Am.Jur.2d *Collection and Credit Agencies* § 59, at 245 (1976).

■ Accordingly, in an action under the FCRA, in addition to recovery of actual damages, punitive damages may also be recovered. In such an action, it is not necessary that punitive damages bear a reasonable relationship to actual damages.

A New York court has set forth factors which may be considered in assessing punitive damages in an action under the FCRA:

> In determining the proper amount of punitive damages to be assessed, the court must consider a variety of things: the remedial purpose of the Act, the harm to consumers intended to be avoided or corrected thereby, the manner in which the defendant conducted its business and dealt with the plaintiff, as well as the defendant's income and net worth.

*Nitti v. Credit Bureau of Rochester, Inc.,* 84 Misc.2d 277, 281, 375 N.Y.S.2d 817, 821 (Sup.Ct.1975).

The circuit court in this case instructed the jury that these very same four factors may be considered in assessing punitive damages against the appellant.[8]

**8.** "Plaintiff's Instruction No. 11" provides:

The Court instructs the jury that if you find the Credit Bureau of Huntington willfully failed to follow reasonable procedures to assure maximum possible accuracy of information concerning the Joneses then you may award the Joneses punitive damages.

Willfull [sic] has been defined to be voluntary or conscious acts. There is no requirement that you must find the Credit Bureau deliberately or intentionally set out to injure the Joneses.

In order to award punitive damages the jury need not find malice or evil motive on the part of the Credit Bureau and the jury need not tie the amount of the punitive damages to the amount of compensatory damages.

Some of the factors that the jury may consider in assessing punitive damages include:

(a) the remedial purpose of the Fair Credit Reporting Act;

(b) the harm to the consumer intended to be avoided or corrected by the Act;

(c) the manner in which the defendant Credit Bureau conducted its business; and

(d) defendant Credit Bureau['s] income and net worth.

With regard to the remedial purpose of the FCRA and the harm to be avoided thereunder, one of the instructions given to the jury emphasized the Congressional findings which led to enactment of the FCRA.[9]

With regard to the manner in which the appellant conducted its business, this factor focuses on a key element in awarding punitive damages, that is, whether the appellant's actions in failing to comply with the FCRA were willful.

■ Under 15 *U.S.C.* § 1681n (1988), punitive damages "are within the discretion of the court and malice or evil motive need not be found for such award, but the violation must have been willful." *Thornton v. Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). *Accord, Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 972 (4th Cir.1987); *see also Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986), *cert. denied,* 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 766, and *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987).

Recognizing that "willful ... is a word of many meanings, its construction often being influenced by its context[,]" *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418, 422 (1943), it "often denotes an act which is intentional, or *knowing,* or voluntary, as distinguished from accidental." *Black's Law Dictionary* 1600 (6th ed. 1990) (emphasis supplied).

■ The appellees point to several facts which signify the appellant's willfulness: the appellant's knowledge that its employee, Robertson, was not properly trained; the possibility that the appellant's customers will only see the "judgments recorded" and will not see corrections; that the appellant made a voluntary and conscious decision to not spend time and money on training or double-checking its employees' work; that the appellant's employee, Robertson, did not read the entire file with respect to the information reported about the appellees; and that the appellant's employee, Robertson, was highly rated by a supervisor who never checked the employee's work.

For these reasons, the appellees maintain that the appellant's actions were willful.

In *Nitti,* the New York court held that because the system under which the defendant operated did not include independent verification of outstanding judgments and that only two percent of over 50,000 credit reports are authenticated, then this routine contributed to "what the jury must have viewed as a calculated disregard of the plaintiff's many efforts to have his report corrected." 84 Misc.2d at 281, 375 N.Y. S.2d at 822. The *Nitti* court went on to observe that Congress recognized that "it might be necessary to cause and, if need be, to coerce a change in the defendant's operations in order to make it comply with the law." *Id.*

Finally, with regard to the financial position of the appellant, statements of income indicated that the appellant had net income

---

If you the jury find from a preponderance of the evidence that the plaintiffs have proven willful noncompliance with the Fair Credit Reporting Act by the Credit Bureau then you may assess punitive or exemplary damages to punish the offender and as a warning to others by way of example.

The amount of these damages are to be determined by you to achieve this desired goal.

9. "Plaintiff's Instruction No. 1" provides, in pertinent part:

The Court instructs the jury that the Congress of the United States in 1970 passed a law known as the Fair Credit Reporting Act. In this Act, Congress found that it was essential to have fair and accurate credit reporting.

Congress further found that an elaborate mechanism had been developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character and general reputation of consumers. They further found that consumer reporting agencies such as the Credit Bureau of Huntington, Inc. had assumed a vital role in assembling and evaluating the consumer credit and other information on consumers.

The Congress of the United States concluded 'there is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and with respect for the consumer[']s right to privacy.'

of $68,032 in 1986, and $69,875 in 1987. Furthermore, balance sheets indicated that the appellant's net worth in 1986 was $317,-432, and in 1987 it was $387,308. *See Collins v. Retail Credit Co.*, 410 F.Supp. 924, 931 (E.D.Mich.1976) (financial statements introduced in assessing punitive damages).

The circuit court's instruction on punitive damages was obviously in accord with the spirit and intent of the FCRA.

██ Accordingly, in an action under the FCRA, in assessing punitive damages, the jury may consider: (1) the remedial purpose of the Act; (2) the harm to the consumer intended to be avoided or corrected by the Act; (3) the manner in which the consumer reporting agency conducted its

business; and (4) the consumer reporting agency's income and net worth.

Therefore, there was no error by the circuit court in not setting aside the jury verdict of $42,500 punitive damages.

## V

Consistent with the foregoing, the judgment of the Circuit Court of Cabell County is affirmed.[10]

Affirmed.

---

10. The appellant also maintains that a remittitur would be appropriate in this case. This issue is raised by the appellant with respect to both actual and punitive damages. We are aware of one federal case under the FCRA wherein a remittitur was employed to reduce an award of punitive damages from $300,000 to $50,000 due to excessiveness. *Collins v. Retail Credit Co.*, 410 F.Supp. 924 (E.D.Mich.1976). However, be-

cause of our decision in this case that neither verdict is excessive, a remittitur would not be appropriate.

At the conclusion of its brief, the appellant has requested that it be awarded attorney's fees. However, in light of our decision in this case, we need not address this issue.