Mary L. BORIS, Plaintiff,

v.

**CHOICEPOINT SERVICES, INC. d/b/a
ChoicePoint Consumer Center,
and/or C.L.U.E., Defendant.**

No. CIV.A.3:01CV–342–H.

United States District Court,
W.D. Kentucky,
At Louisville.

March 14, 2003.

Bernard D. Leachman, Jr., Louisville, KY, for Plaintiff.

R. Van Young, Lisa H. Thomas, Greenebaum Doll & McDonald, Louisville, KY, and Meredith L. Sidewater, Alpharetta, GA, for Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Defendant, Choicepoint Services, Inc. ("Choicepoint"), has moved for relief from the jury's verdict that Choicepoint violated the Fair Credit Reporting Act ("FCRA") and its award of $197,000 in compensatory damages and $250,000 in punitive damages. Choicepoint raises a number of issues to support a judgment notwithstanding the verdict, a new trial or remittitur. Plaintiff, Mary L. Boris, has filed a detailed defense of the verdict. The motions do not raise complex legal issues, but rather concern the sufficiency of the proof.

Judgment notwithstanding the verdict is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party. *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175–76 (6th Cir.1996). Similarly, Choicepoint is entitled to a new trial only if the jury reached "a seriously erroneous result" as indicated by a verdict that was against the weight of the evidence, excessive in damages, or the product of an unfair trial. *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir.1996). With the exception of the compensatory damages award, the Court does not believe Choicepoint's arguments justify altering the jury's verdict. This was a sound and thoughtful jury. The Court reluctantly concludes the compensatory damages award should be reduced to $100,000. The Court makes the following observations in

support of that conclusion.[1]

## I.

Choicepoint is a nationwide credit reporting agency which circulates what it terms a "C.L.U.E. report" ("Choicepoint" or "claims" report) which provides information to potential insurers on an individual's claim history. In February 2000, Plaintiff first learned about her claims report when her current home and automobile insurer, Encompass/CNA/Continental Insurance ("CNA"), sent her a nonrenewal notice. Plaintiff subsequently obtained a copy of her claims report which, incorrectly, showed that she had made four fire claims and an "extended loss" claim over a short period of time. As it turns out, Plaintiff had made prior claims resulting from hail damage that caused her roof to leak, as well as a leaky washing machine; she had never made claims that fell under these cause of loss codes. Upon learning about this information, Plaintiff contacted Choicepoint, who told her CNA caused the problem. She then contacted the Kentucky Department of Insurance. After being notified by the Kentucky Department of Insurance, Choicepoint worked with CNA to correct these inaccurate cause of loss codes. Plaintiff's August 8, 2000 claims report reflects this change.

Several months later, however, when Plaintiff was researching insurance rates through her agent, Lynn Whobrey, she learned that her latest claims report listed four fire claims, an "extended loss" claim, as well as the four claims she had made for water damage. Intensely frustrated by her inability to obtain affordable coverage because she was considered by the insurance industry to be a high risk, she contacted her brother who is also a local attorney who filed this suit on her behalf. Tellingly, the suit was filed on May 23, 2001 in Jefferson County Circuit Court, but the false information remained on her claims report: Plaintiff's December 20, 2001 report still showed nine claims. There appears to be no dispute that at least five of these claims were completely erroneous. The false claims information remained on her report as late as March 2002, causing Plaintiff much mental anguish and anxiety and forcing her to pay higher insurance rates.

## II.

Congress enacted the FCRA "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel insurance, and other information in a manner which is fair and equitable to the consumer with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information ..." 15 U.S.C. § 1681(b). To guard against abuse of consumer credit rights, the FCRA creates a private right of action against credit reporting agencies for negligent violations of any responsibility the statute imposes. 15 U.S.C. § 1681o. Choicepoint argues that Plaintiff failed to prove (1) Choicepoint was negligently noncompliant, (2) that its noncompliance caused her injury, and (3) that she is entitled to her $197,000 compensatory damages award. The Court now addresses each of those claims.

1. By these observations, the Court must necessarily make negative inferences about Choicepoint's actions, motivations and trial strategy. One cannot ignore the likelihood that the jury may have drawn similar negative inferences. None of the Court's comments are meant to overly or unfairly criticize Choicepoint. However, it is an unavoidable observation that these factors terribly damaged the company's credibility. While Choicepoint might prefer to ignore these impressions, the Court concludes that the jury paid great attention to them.

## A.

Choicepoint first argues that Plaintiff failed to meet her burden of proving a negligent violation of the FCRA. Two FCRA provisions are at issue in this case, 15 U.S.C. § 1681e(b) and 15 U.S.C. § 1681i(a). The Court discusses the proof relating to each of these requirements independently, although a negligent failure to comply with either part of the law constitutes a § 1681o violation.

### 1.

In preparing Plaintiff's claims report, Choicepoint must comply with 15 U.S.C. § 1681e(b), which states, "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Choicepoint's argument as to why there was insufficient evidence to create a triable fact on this point is two-fold. First, it argues that a consumer reporting agency ("CRA") acts reasonably so long as it accurately transcribes information from a reputable third party. Second, it claims that because it did this and because Plaintiff testified that CNA was circulating the same false information to other CRA's, it is absolved from liability. The Court does not read the § 1681e(b) requirements so narrowly.

■ As the Sixth Circuit stated in the seminal case on this subject, *Bryant v. TRW, Inc.*, 689 F.2d 72, 78 (6th Cir.1982), "the standard of conduct by which the trier of fact must judge the adequacy of [consumer reporting] agency procedures is what a reasonably prudent person would do under the circumstances." The question of whether an agency followed "reasonable procedures" is typically a fact question reserved for the jury. *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir.2001); *Cahlin v. General Motors Ac-*

*ceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991). Choicepoint now claims that Plaintiff did not meet her burden under § 1681e(b) because she failed to show what a reasonably prudent company would do under similar circumstances. But under this reasonableness standard, Plaintiff is clearly not required to present specific evidence about how other companies respond in similar circumstances. *See Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F.Supp. 962, 968 (S.D.Ohio 1983) (holding that "it is not plaintiff's burden to suggest ways in which defendant might improve its operation"). Instead she must prove that, through its own actions and inactions Choicepoint acted unreasonably. Certainly, Choicepoint could have brought in representatives from other CRAs to show that its actions were reasonable. But as part of its litigation strategy, Choicepoint chose not to do so. Instead it contends Plaintiff has provided *no evidence* that Choicepoint acted unreasonably.

■ The Court disagrees for several reasons. First, the series of facts Plaintiff laid out, on their face, create sufficient proof that Choicepoint did not follow reasonable procedures to assure maximum possible accuracy. One could infer from the evidence that Choicepoint included incorrect data on Plaintiff's claims report; that Plaintiff complained about this false information; and that after the original mistakes were corrected, more incorrect claims data reappeared on her report and remained well after the suit was filed. Based on this series of events, a jury could certainly conclude that a reasonably prudent company would have prevented a similar outcome.

Second, Choicepoint's witnesses made particularly negative impressions upon the jury. They repeatedly denied making any mistakes, and, instead, seemed to

blame all defective data on others. Furthermore, Choicepoint employees appeared slow to recognize problems even once they were put on notice and disclaimed all responsibility. No Choicepoint witness, for instance, ever took responsibility for assuring that its data was accurate. Most notably, they seemed annoyed at even having to appear at trial.

Third, Choicepoint never really explained the computer glitches which apparently caused this problem.[2] To this day, the Court is still unclear what procedures, if any, Choicepoint uses to insure the accuracy of its mass circulated reports. Choicepoint now claims, for instance, that it clearly showed that it was CNA's responsibility to ensure all of the coding was accurate. But the evidence showed that Choicepoint may have had requirements which CNA was required to comply with but were never enforced. There can be little doubt that all of these factors weighed heavily against Choicepoint when the jury sought to assess the reasonableness of its procedures.

In short, all along Choicepoint seemed to assume that it could not be blamed for the incorrect data translations. But at trial, the evidence appeared to this observer far more muddled than Choicepoint is willing to concede. Certainly, if nothing else, the facts were subject to sufficiently different interpretations that a reasonable jury could reach different conclusions from those Choicepoint believes are so clear. *See Morris*, 563 F.Supp. at 968 (finding that where false information was deleted and reappeared on plaintiff's credit report and that reappearance was "inexplicable," the defendant's behavior was "inexcusable and clearly demonstrate[d] defendant's failure to follow reasonable procedures").

**2.**

Choicepoint next argues that Plaintiff failed to prove that it violated 15 U.S.C. § 1681i(a), which sets forth the procedures a CRA must follow if a consumer disputes information on her report. Specifically, once a consumer notifies the CRA that an error appears on her report, the agency is obligated under § 1681i to conduct a more thorough investigation. As part of its detailed investigation obligation, a CRA is not allowed to reinsert information until the source of the information certifies its accuracy and the CRA notifies the consumer within five days of the reinsertion. 15 U.S.C. § 1681(a)(5)(B)(I)-(iii). Moreover, in addition to its § 1681e(b) obligation with regard to preparation of a consumer report, a CRA must "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted ..." 15 U.S.C. § 1681i(a)(5)(C).

▆▆ Among the relevant factors used to determine whether a CRA acted reasonably under this standard are "whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable" and "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." *Henson v. CSC Credit Services*, 29 F.3d 280, 287 (7th Cir. 1994). Absent a reasonable argument to the contrary, a credit reporting agency that receives notice of a dispute may be required to verify the information's accuracy with the initial source of information. *Id.; see also Cahlin*, 936 F.2d at 1160 ("A [§ 1681i(a) ] claim is properly raised when a particular credit report contains a factual

**2.** In Section IV of this Memorandum, the Court discusses Choicepoint's attempt to introduce evidence of Encompass' responsibility.

deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry"). Choicepoint argues that Plaintiff did not comply with their procedures because she complained to the Choicepoint representative handling property reports as opposed to the representative dealing with consumer disputes. Additionally, Choicepoint again claims that the false information came from CNA and, further, denies that it ever placed the misinformation back on her report. Based on these facts, Choicepoint claims there was insufficient evidence for the jury to find that it violated the § 1681i(a) requirements.

Once again the Court returns to trial where the evidence was anything but clear. What is clear, however, is that in on June 28, 2000, Plaintiff learned her claims report included four "fire" claims and one "extended loss" claim. At most, she testified, there should have been four water claims. All parties agree Plaintiff never made a fire claim. The Court is still unsure of what an "extended loss" claim is. Plaintiff testified that she then called Choicepoint four separate times to get the problem corrected and was given the run around until she was finally told to submit something in writing. At that time, she said she submitted a written complaint to the Kentucky Department of Insurance. Choicepoint was then notified by the Insurance Department of the false information and was told by CNA to change the cause of loss codes for the four "fire" claims to "water." On August 8, 2000, Plaintiff received her claims report which reflected the change.

For some reason, however, by February 28, 2001—a full six months after Choicepoint was on notice that there was a problem with her report—Plaintiff obtained a copy of her report which now showed nine claims, including four additional claims for fire. The inaccurate claims may have been reinserted soon after the claim record was first corrected in August, 2000. She testified that on March 15, 2001, GEICO informed her they could not insure her do to the inordinate number of losses appearing on her claims report compiled by Choicepoint. She sued Choicepoint on May 23, 2001. Furthermore, Plaintiff's evidence showed that on December 20, 2001, Allstate Insurance Company requested her report, which still showed the nine claims. Plaintiff testified that as recently as April of 2002, Allstate informed her she was uninsurable, based on her Choicepoint report.

The Court finds this is sufficient evidence, coupled with the aforementioned lack of credibility born out by Choicepoint's witnesses and the Plaintiff's own persuasive testimony, from which a reasonable jury could conclude Choicepoint did any of the following in violation of § 1681i(a): (1) "reinserted" previously deleted information without checking its accuracy, (2) failed to notify Plaintiff of that reinsertion within five days of doing so, and (3) failed to maintain reasonable procedures designed to prevent the reinsertion of that false information. At trial, rather than putting on evidence of how it attempted to check the veracity of CNA's data, Choicepoint simply sat back and sought to blame its reinsertions on CNA. In so doing, however, Choicepoint never called a witness from CNA. Nor did it clearly explain how, six months after complaints were made, the number of claims on Plaintiff's claims report had inexplicably doubled. In light of this strategy, there was certainly conflicting evidence from which a reasonable jury could find in Plaintiff's favor with regard to § 1681i(a). *See Bryant,* 689 F.2d at 79 (finding that where a credit agency knew of a dispute between the consumer and creditors and

where the consumer had complained about his consumer report, merely making two telephone calls to the creditors was insufficient to re-verify the information contained in the report).

## B.

Choicepoint next contends the evidence does not establish Plaintiff suffered a compensable injury due to its negligence. The Court repeatedly and carefully considered this issue at trial, in preparing the jury instructions, and again before submitting the case to the jury. The Court concluded at each of those intervals that Plaintiff presented no real evidence of tangible loss. Thus, for example, the Court kept out evidence of acupuncture expenses which Plaintiff claimed were related to pain Choicepoint caused her, because there was an insufficient causal link. That being said, the Court was quite persuaded all along by Plaintiff's testimony that she was very much emotionally distraught and suffered intensely because of Choicepoint's carelessness.

 It is well settled that actual damages under the FCRA are not limited to out-of-pocket expenses and may instead include humiliation and mental distress. See, e.g., Cousin, 246 F.3d at 369; Casella v. Equifax Credit Information Servs., 56 F.3d 469, 474 (2nd Cir.1995); Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir.1995); Bryant v. TRW, Inc., 487 F.Supp. 1234, 1240 (E.D.Mich.1980). At trial, to prove her humiliation, mental distress, and embarrassment, Plaintiff relied on her own testimony and that of her two co-workers in support of her damages claim. Choicepoint argues that this testimony is insuffi-

cient to support even a claim of emotional distress and, further, that Plaintiff failed to differentiate between the stress caused by the inaccurate credit report and other stress in her life.

These were fair arguments—at trial. Unfortunately for Choicepoint, Plaintiff and her co-workers were very believable witnesses who articulated a clear and credible picture of the emotional turmoil Choicepoint caused. This is more than enough to support a claim for emotional distress.[3]

As to causation, the evidence is clear that it was Choicepoint's circulation of the false report to potential third party insurers that caused Plaintiff particular difficulty in locating homeowner's insurance in February 2000. See Casella, 56 F.3d at 475 (noting that proof of evidence that a creditor or third-party learned of derogatory information is essential in order to recover for emotional damages, humiliation, or anxiety). As the testimony also showed, it was only after Plaintiff contacted Lynn Whobrey that she was able to obtain coverage from Nationwide costing her $200 more per year, despite the fact Whobrey ignored the false information circulating on her Choicepoint report. Throughout 2000, Plaintiff tried unsuccessfully to obtain lower coverage. As her visibly shaken testimony suggested, this inability to locate cheaper insurance coupled with the false information that she was clearly unable to fix made her very upset. She stated that she was very worried that, should Whobrey retire, she would be unable to locate affordable coverage based on the report showing as many as nine claims. As a result, she had many sleepless nights, was making herself a ner-

---

**3.** Plaintiff's testimony and that of her co-workers was sufficiently specific to constitute direct evidence of her emotional distress, rather than being merely conclusory state-

ments or speculation about future distress. Compare Field v. Trans Union LLC, 2002 WL 849589, at *2 (N.D.Ill.2002).

vous wreck, and was unable to function properly at work.

Based on Plaintiff's testimony and the additional evidence from two very credible witnesses, a jury could quite reasonably find that Choicepoint's actions caused the emotional distress which Plaintiff so vividly described. *See, e.g., Stevenson,* 987 F.2d at 297 (finding injury where plaintiff was denied credit three time and experienced considerable embarrassment from having to discuss the problems with business associates); *Pinner v. Schmidt,* 805 F.2d 1258, 1265 (5th Cir.1986) (finding liability were embarrassment and stress resulted from lengthy dealings with credit bureau); *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834 (8th Cir.1976) (noting the considerable time the Plaintiff spent fighting the inaccurate reports as a factor in determining liability).

### C.

■ While the jury's decision as to liability was not a particular surprise, its decision as to the amount of compensatory damages was. That leads the Court to the difficult question of whether the evidence supports the jury's $197,000 compensatory damages award or whether that award must be reduced. The Sixth Circuit has determined a jury verdict should not be remitted by a court "unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Jackson v. City of Cookeville,* 31 F.3d 1354, 1358 (6th Cir.1994) (*citing Farber v. Massillon Bd. of Educ.,* 917 F.2d 1391, 1395 (6th Cir.1990)). Thus, a jury's award must stand unless it is (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake. *Bickel v. Korean Air Lines Co., Ltd.,* 96 F.3d 151, 156 (6th Cir.1996) (*citing Leila Hosp. & Health Ctr. v. Xonics Medical Sys.,* 948

F.2d 271, 278 (6th Cir.1991)). The Court finds no reason to think this jury was swayed by passion or bias. Nor does the Court think this result is so excessive as to shock the conscience. Assessing whether the jury's award is supportable by proof, however, is a closer question and requires careful consideration.

■ In his closing argument, Plaintiff's counsel calculated that Plaintiff was owed $35,100 for her emotional distress up to the trial, and an additional $23,400 from the trial until 2005. Plaintiff's counsel calculated these amounts based on a reasonable assumption that Plaintiff worried about or was tormented for fifteen hours per week, or slightly less than 2.5 hours/day. The proof certainly supports such an argument. Her co-workers testified that Plaintiff was typically not easily shaken but that, during this ordeal, she cried at work on several occasions from the inordinate stress the ongoing circulation of false information caused. Co-worker Kimberly Rowe, for example, stated that Plaintiff talked with her about the Choicepoint situation and that Plaintiff was clearly angered and upset by her ongoing problems. Milburn Howard provided similar testimony. Thus, the jury could reasonably conclude Plaintiff should be awarded $58,500.00. Furthermore, the jury was free to reasonably go beyond this suggested hourly range in their own calculation of her pain. It probably did so based on the believability of the testimony.

■ What is more troubling is that, after requesting this amount, counsel asked for an additional $250,000 for damages to her business reputation. True, even where no pecuniary or out-of-pocket loss has been shown, the FCRA does permit recovery not only for humiliation and mental distress, but for injury to one's reputation and creditworthiness. *Bryant,* 689 F.2d at 79 (citing Representative Sulli-

van's remarks, set forth at 116 Cong.Rec. 36570 (1970)); *see also Cousin,* 246 F.3d at 369 n. 15. However, there must be proof to support a finding of actual or compensatory damages. It is important to remember that damages for emotional distress and damages for business reputation are based on entirely different evidentiary foundations. Plaintiff's credible testimony can support her own claim of emotional distress. However, damage to credit or business reputation must rest upon some extrinsic evidence, not just upon Plaintiff's opinion.

The record is very limited as to proof of damages beyond Plaintiff's own testimony of worry, stress, anxiety, loss of sleep, and anger. The only evidence the Court is able to identify to support Plaintiff's claim that her business reputation was damaged was her testimony that both Allstate and GEICO turned her down when she requested insurance. The Court cannot say that the remainder of the jury's award is supportable based on Plaintiff's testimony that two companies turned down her insurance request. The Sixth Circuit has stated that in some cases, "reductions in awards may well be justified even when the amount in controversy does not necessarily shock the conscience, but rather leaves us with the definite and firm conviction that a mistake has been committed, resulting in plain injustice." *Anderson v. Conwood Co.,* 34 F.Supp.2d 650, 653 (W.D.Tenn.1999); *quoting Neyer v. United States,* 845 F.2d 641, 645 (6th Cir.1988). In this case, even if one were to assume that the jury awarded her in excess of $58,000 for emotional distress, attributing well over $100,000 to loss of reputation is incomprehensible based on this evidence.

Having made this finding, the far more difficult task is to determine how much the Plaintiff's award for actual damages should be decreased. Damages for reputation, like damages for emotional distress and humiliation are intangible and the Court is leery of trying to replace the jury's math. However, the proof as to loss of reputation was many times less forceful than that as to emotional distress. In light of these facts, the Court believes it was quite plausible for the jury to have found damages for emotional distress as high as $75,000, which is about 30 percent more than requested. However, it is inconceivable that damages for loss of reputation could exceed a third of the emotional distress damages on this evidence. Furthermore, at most, the jury could also have reasoned that Choicepoint owed Plaintiff an additional $25,000 for damages to her reputation based on the limited evidence she provided. True, this award may still seem high. But Choicepoint did not make an effective evidentiary or rhetorical response to Plaintiff's case. Instead, it chose to belittle her or blame her problems on a prior divorce. This heavy-handed tactic in retrospect was probably a bad idea and likely backfired with the jury. Balancing these considerations, the Court concludes an award of $100,000 is the maximum that a reasonable jury could find Choicepoint owed Plaintiff. *See also Anderson,* 34 F.Supp.2d at 656 (reducing plaintiff's compensatory damages award in a FCRA case from $2,000,000 to $50,000 where plaintiff offered no evidence beyond statements that she was stressed).

### III.

Next, the Court considers Choicepoint's argument that the punitive damages award was unfounded. Section 1681n provides for civil liability in cases where the defendant willfully fails to comply with FCRA. In such a case, punitive damages may be awarded. 15 U.S.C. § 1681n(a)(2). Choicepoint argues that it cannot be liable under § 1681n because there was no proof it acted willfully. "To show willful noncompliance with the FCRA, [the Plaintiff]

must show that [Choicepoint] knowingly and intentionally committed an act in conscious disregard for the rights of others, but need not show malice or evil motive." *Bakker v. McKinnon,* 152 F.3d 1007, 1013 (8th Cir.1998); *accord Cushman,* 115 F.3d at 226; *Pinner,* 805 F.2d 1258. To be sure, this is not a case, as Choicepoint seeks to paint it, where there was an isolated instance of human error which Choicepoint promptly cured, *see Stevenson,* 987 F.2d at 293–94 (finding no willfulness where the agency was negligent and slow to correct information), or where, upon discovery, Choicepoint quickly took ameliorative action. *See Thomas v. Gulf Coast Credit Services, Inc.,* 214 F.Supp.2d 1228 (M.D.Al.2002). Nor is it an instance where Choicepoint can defend itself by simply claiming it relied on information it assumed was accurate, *see Casella,* 56 F.3d at 476 (finding no willful violation for refusal to delete allegedly false information in credit report when CRA had reason to believe the information was accurate), or where it assumed its actions were lawful. *See Duncan v. Handmaker,* 149 F.3d 424, 429 (6th Cir.1998) (declining to find a § 1681n violation where the charge was that the defendants violated the FCRA provision requiring that they have a proper purpose in obtaining a consumer's report but later learning their purpose was impermissible).

■ Here, to the contrary, a reasonable juror could believe the following from the evidence presented at trial. Having learned there were "fire" claims on her report that should instead be listed as "water," Plaintiff called four times to get the cause of loss code switched. After changing "fire" to "water," Choicepoint added the four fire claims back onto her report, in addition to the five claims which it had already corrected. This was despite now knowing that CNA, Plaintiff's prior insurer, may have sent it bad information. Once Plaintiff filed suit, Choicepoint al-lowed the false claims to remain on her report. Those false claims circulated to other potential insurers for nearly eleven months until they were finally kicked out of Choicepoint's computer because the data was so old it expired. Add to this series of events, the fact Choicepoint has yet to apologize and displayed a generally uncaring attitude at trial. The Court believes there was ample evidence from which a reasonable person could find Choicepoint "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Bakker,* 152 F.3d at 1013.

■ An excessive award of punitive damages may, however, implicate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Thus, in analyzing whether an award is too high, courts must consider three factors: (1) the degree of reprehensibility of defendant's conduct; (2) the ratio between the plaintiff's compensatory damages award and the punitive damages award; and (3) the difference between the civil or criminal sanction that could be imposed for the misconduct. *Clark v. Chrysler Corp.,* 310 F.3d 461, 481–82 (6th Cir.2002).

■ Choicepoint argues that the $250,000 award is disproportionately high because it is $50,000 higher than Plaintiff requested during closing and because Plaintiff claimed no compensatory damages for out-of-pocket losses. Neither of these arguments are persuasive in this context. First, in this case, there was plausible evidence from which a jury could deduce a corporate conglomerate like Choicepoint should be punished more than the attorney requested. With that in mind, the following facts likely account for the large verdict: (1) Choicepoint knew the FCRA's requirements; (2) it was on

notice that there was a problem with Plaintiff's report, but failed to correct those problems; (3) Choicepoint failed to take seriously the computer problems even after they became known; (4) not one of Choicepoint's employees ever accepted responsibility for the accuracy of the claims data and, in fact, everyone blamed others; (4) Choicepoint showed a complete lack of sympathy for Plaintiff's problems; and (5) throughout trial, Choicepoint made several ill-advised efforts at trial to blame or criticize Plaintiff for her own problems. Second, the punitive damages are not out of proportion to the compensatory damages nor do they appear disproportional to the resources of the company. The Sixth Circuit has said, since the Fair Credit Reporting act is intended to protect consumers, it is to be liberally construed in support of that purpose. *Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 964 (6th Cir.1998). The Court thus finds no reasonable basis for saying that the award is too high or unwarranted.

### IV.

Choicepoint has several complaints about evidentiary rulings which the Court now addresses. First, Choicepoint says that the Court erred by not admitting an electronic e-mail from Ms. Cliff, a CNA employee, to Steve Nolan, a Choicepoint employee, which purported to state that certain inaccurate loss codes were caused by problems with a CNA computer program. The e-mail discusses a highly technical subject and suggests an opinion based on some investigation or expertise. This issue was discussed several times on the record and Defendant presented no adequate reason for its admission.

■ Choicepoint sought to admit the e-mail to prove the truth of the statements by a CNA employee who said it was CNA's computer program that caused the inaccurate data. Her opinion by e-mail was offered for its truth. There was no opportunity for the Plaintiff to cross-examine Cliff or to search for an explanation. Her testimony was procured by Choicepoint to help itself. That her testimony may have been somehow against CNA's interest does not make the statement any more credible or admissible because CNA is not a party to this case. Therefore, the Court cannot evaluate the extent which this statement is adverse and thus might tend to be more reliable. In short, this e-mail was clearly hearsay. That it may have existed in a Choicepoint file does not create reliability for the truth of statements it contains. Moreover, without further explanation, the e-mail opinion is without credibility. This testimony, without the chance for Plaintiff to test it by cross examination, carries great potential for unfair damage that far outweighs its limited credibility and value.

Additionally Choicepoint objected to the introduction of a 684–page exhibit of consumer complaints or questions, which Plaintiff introduced in its own proof. Once again, the parties and the Court discussed this issue various times at some length on the record. This Memorandum only amplifies that discussion.

■ The exhibit was broadly relevant to show the types of complaints Choicepoint received, how those complaints were processed and Choicepoint's knowledge of complaints generally. The Court allowed the evidence because it was helpful to the jury's understanding of Choicepoint's otherwise ambiguous complaint process. During discussions, Choicepoint's counsel convinced the Court that the complaints could be easily explained. The Court conceived that the evidence might end up being helpful to Choicepoint, because most of the complaints were resolved and only a few, out of thousands, resulted in legal proceedings.

The Court rejected Plaintiff's request to read an interrogatory which could have mischaracterized the documents. The Court also rejected Plaintiff's contention that the documents constituted a judicial admission. The Court did provide a brief explanation to the jury upon admission of the documents. The Court did make clear that the exhibit included all "complaints, inquiries, questions, in that vein, about inaccurate, misleading information or other questions that they had about the reports." The documents were admitted "subject to later testimony and clarification."

The reason that this exhibit may have proved damaging is that no Choicepoint witness adequately explained either the records or the complaint process. In fact, during its entire case, Choicepoint brought forth no witness who could provide a cogent explanation of the process. Most of the Choicepoint witnesses seemed to have no knowledge of the document or the process for resolving complaints. Thus, due to Choicepoint's apparent inability to adequately explain what Plaintiff's counsel proffered, the evidence may have been a lot more damaging than anticipated. Importantly, the failure of Choicepoint witnesses to properly explain the evidence or provide a defense does not make the evidence itself inadmissible.

## V.

In sum, the Court finds that the jury's findings as to liability and punitive damages should be upheld, but that the compensatory damages award must be reduced to $100,000. The Court may not simply reduce the compensatory damage award because doing so would infringe upon Plaintiff's Seventh Amendment right to a jury trial. *See Hetzel v. Prince William County, Va.*, 523 U.S. 208, 210, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998) (per curiam); *Farber*, 917 F.2d at 1396. Rather, the proper procedure is to give Plaintiff the choice of either accepting the remittitur or rejecting it and forcing a new trial limited to the issue of compensatory damages. *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 976 (6th Cir.1974). The order granting Plaintiff this choice is not a final and appealable order. *Anderson v. Roberson*, 249 F.3d 539, 542 (6th Cir.2001).

The Supreme Court has made it clear that, if Plaintiff accepts the Court's remittitur, then she cannot appeal the order which gave her that choice. *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). Similarly, an order setting the case for a new trial is also not final and hence not appealable. *See Anderson*, 249 F.3d at 543. Therefore, if Plaintiff chooses not to accept the remittitur, she must proceed to judgment after a second trial on damages. *Id.* At the conclusion of the second trial and the entry of that judgment, she may then challenge the Court's entry of this order giving her the choice between the remittitur and new trial and ask for a reinstatement of the verdict from the first trial. *See, e.g., Kirsch v. Fleet St., Ltd.*, 148 F.3d 149 (2nd Cir.1998); *Ash v. Georgia–Pacific Corp.*, 957 F.2d 432, 438 (7th Cir.1992). If she fails to prevail on that argument, however, she must accept whatever the outcome the second trial yields. Plaintiff shall inform the Court of her decision to accept the remittitur or instead proceed to a new trial on damages within 14 days from the entry date of the Order.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court has considered Choicepoint's motion for a judgment notwithstanding the evidence, new trial, or remittitur. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Choicepoint's motion seeking relief as to

liability, the punitive damages award or for a new trial is DENIED.

IT IS FURTHER ORDERED that Plaintiff's $197,000 jury award for compensatory damages is reduced to $100,000.

IT IS FURTHER ORDERED that Plaintiff has 14 days from the entry of this Order to accept the Court's remittitur or request a new trial on the sole issue of compensatory damages.