PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SUZANNE SLOANE,
                      *Plaintiff-Appellee,*

              and

JOHN T. SLOANE,
                              *Plaintiff,*

              v.

EQUIFAX INFORMATION SERVICES,
LLC,
                      *Defendant-Appellant,*

              and

TRANS UNION, LLC; EXPERIAN
INFORMATION SOLUTIONS,
INCORPORATED; CITIFINANCIAL,
INCORPORATED,
                              *Defendants.*

No. 06-2044

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:05-cv-01272-LMB)

Argued: November 1, 2007

Decided: December 27, 2007

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed in part and reversed and remanded in part by published opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Michael joined.

**COUNSEL**

**ARGUED:** Mara McRae, KILPATRICK STOCKTON, L.L.P., Atlanta, Georgia, for Appellant. Alexander Hugo Blankingship, III, BLANKINGSHIP & ASSOCIATES, P.C., Alexandria, Virginia, for Appellee. **ON BRIEF:** Timothy J. McEvoy, ODIN, FELDMAN & PITTLEMAN, P.C., Fairfax, Virginia; Bradley J. Miller, C. Allen Garrett, Jr., KILPATRICK STOCKTON, L.L.P., Atlanta, Georgia, for Appellant. Thomas B. Christiano, BLANKINGSHIP & ASSO-CIATES, P.C., Alexandria, Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After Suzanne Sloane discovered that a thief had stolen her identity and ruined her credit, she notified the police and sought to have Equifax Information Services, LLC, a credit reporting service, correct the resulting errors in her credit report. The police promptly arrested and jailed the thief. But twenty-one months later, Equifax still had not corrected the errors in Suzanne's credit report. Accordingly, Suzanne brought this action against Equifax for violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C.A. § 1681 *et seq.* (West 1998 & Supp. 2007). A jury found that Equifax had violated the Act in numerous respects and awarded Suzanne $351,000 in actual damages ($106,000 for economic losses and $245,000 for mental anguish, humiliation, and emotional distress). The district court entered judgment in the amount of $351,000. In addition, without permitting Equifax to file a written opposition, the court also awarded Suzanne attorney's fees in the amount of $181,083. On appeal, Equifax challenges the award of damages and attorney's fees. We affirm in part and reverse and remand in part.

I.

On June 25, 2003, Suzanne Sloane entered Prince William Hospital to deliver a baby. She left the hospital not only a new mother, but also the victim of identity theft. A recently hired hospital employee named

Shovana Sloan noticed similarity in the women's names and birth dates and, in November and December 2003, began using Suzanne's social security number to obtain credit cards, loans, cash advances, and other goods and services totaling more than $30,000. At the end of January 2004, Suzanne discovered these fraudulent transactions when Citibank notified her that it had cancelled her credit card and told her to contact Equifax if she had any concerns.

Unable to reach Equifax by telephone on a Friday evening, Suzanne went instead to the Equifax website, where she was able to access her credit report and discovered Shovana Sloan's name and evidence of the financial crimes Shovana had committed. Suzanne promptly notified the police[1] and contacted Equifax, which assertedly placed a fraud alert on her credit file. Equifax told Suzanne to "roll up her sleeves" and start calling all of her "20-some" creditors to notify them of the identity theft. Suzanne took the next two days off from work to contact each of her creditors, and, at their direction, she submitted numerous notarized forms to correct her credit history.

Suzanne, however, continued to experience problems with Equifax. On March 31, 2004, almost two months after reporting the identity theft to Equifax and despite her efforts to work with individual creditors as Equifax had advised, Suzanne and her husband, Tracey, tried to secure a pre-qualification letter to buy a vacation home, but were turned down. The loan officer told them that Suzanne's credit score was "terrible" — in fact, the "worst" the loan officer had ever seen — and that no loan would be possible until the numerous problems in Suzanne's Equifax credit report had been corrected. The loan officer also told Suzanne not to apply for additional credit in the meantime, because each credit inquiry would appear on her credit report and further lower her score.

Chagrined that Equifax had not yet corrected these errors in her credit report, Suzanne refrained from applying for any type of consumer credit for seven months. But, in October 2004, after the repeated breakdown of their family car, Suzanne and Tracey attempted to rely on Suzanne's credit to purchase a used car at a local

---

[1]The police subsequently apprehended Shovana Sloan, and she was then convicted of and imprisoned for the identity theft.

dealership. Following a credit check, the car salesman pulled Tracey aside and informed him that it would be impossible to approve the financing so long as Suzanne's name appeared on the loan. Similarly, when the Sloanes returned to the mortgage company to obtain a home loan in January 2005, eight months after their initial visit, they were offered only an adjustable rate loan instead of a less expensive 30-year fixed rate loan in part because of Equifax's still inaccurate credit report.

In frustration, on March 9, 2005, more than thirteen months after first reporting the identity theft to Equifax, Suzanne sent a formal letter to the credit reporting agency, disputing twenty-four specific items in her credit report and requesting their deletion. Equifax agreed to delete the majority of these items, but after assertedly verifying two accounts with Citifinancial, Inc., Equifax notified Suzanne that it would not remove these two items. At trial, Equifax admitted that under its "verified victim policy," it should have automatically removed these Citifinancial items at Suzanne's request, but it failed to do so in violation of its own written procedures.

Two months later, on May 9, 2005, Suzanne again wrote to Equifax, still disputing the two Citifinancial accounts, and now also contesting two Washington Mutual accounts that Equifax had previously deleted but had mistakenly restored to Suzanne's report. When Equifax attempted to correct these mistakes, it exacerbated matters further by generating a second credit file bearing Shovana Sloan's name but containing Suzanne's social security number. Compounding this mistake, on May 23, 2005, Equifax sent a letter to Suzanne's house addressed to Shovana Sloan, warning Shovana that *she* was possibly the victim of identity theft and offering to sell her a service to monitor her credit file. Then, on June 7, 2005, Equifax sent copies of *both* credit reports to Suzanne; notably, both credit reports still contained the disputed Citifinancial accounts.

The stress of these problems weighed on Suzanne and significantly contributed to the deterioration of her marriage to Tracey. As a result of the constant denials of credit, she refused to seek routine credit from local stores, which, in turn, sparked angry recriminations from Tracey. In May 2005, the credit situation forced Tracey, a high school teacher, to abandon his plans to take a sabbatical during which he had

hoped to develop land for modular homes with his father. The Sloanes frequently fought during the day and slept in separate rooms at night. In desperation, Suzanne sought the name of a marriage counselor, but her husband refused to go. For his part, Tracey researched how the couple could secure a divorce and left the information for Suzanne to find when she arrived at home from work one day. Also, during this period, Suzanne was frequently unable to sleep at night, and as her insomnia worsened, she found herself nodding off while driving home from work in the evening. Even after the couple took a vacation to reconcile in August 2005, when they returned home, they were greeted with the denial of a line of credit from Wachovia Bank. Two months later, in November 2005, Suzanne again applied to Wachovia for a line of credit, and again the bank turned her down.

On November 4, 2005 — following twenty-one months of struggle to correct her credit report — Suzanne filed this action against Equifax, Trans Union, LLC, Experian Information Solutions, Inc., and Citifinancial, alleging violations of the FCRA. After settling a separate suit against Prince William Hospital and the personnel company that placed Shovana Sloan in the hospital's accounting department, Suzanne settled her claims in this action against Experian, Trans Union, and Citifinancial. Equifax, however, refused to settle. Thus, the case proceeded to trial with Equifax the sole remaining defendant. The jury returned a verdict against Equifax, awarding Suzanne $106,000 for economic loss and $245,000 for mental anguish, humiliation, and emotional distress.

Equifax moved for judgment as a matter of law and for a new trial or remittitur on the jury's award of damages for emotional distress. The district court denied Equifax's post-trial motions and then, without permitting Equifax to submit an opposition to Suzanne's request for attorney's fees, ordered Equifax to pay $181,083 in attorney's fees. This appeal followed.

## II.

Congress enacted the FCRA to require that consumer credit reporting agencies maintain "reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer,

with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C.A. § 1681(b).

In this case, the jury specifically found, via a special verdict, that Suzanne proved by a preponderance of the evidence that Equifax violated the FCRA by negligently: (1) failing to follow reasonable procedures designed to assure maximum accuracy on her consumer credit report; (2) failing to conduct a reasonable investigation to determine whether disputed information in her credit report was inaccurate; (3) failing to delete information from the report that it found after reinvestigation to be inaccurate, incomplete, or unverified; and (4) reinserting information into her credit file that it had previously deleted. On appeal, Equifax does not challenge the jury's findings that Suzanne proved that it violated the FCRA in all of these respects.

The FCRA provides a private cause of action for those damaged by violations of the statute. *See* 15 U.S.C.A. §§ 1681n, 1681o. A successful plaintiff can recover both actual and punitive damages for willful violations of the FCRA, *id.* § 1681n(a), and actual damages for negligent violations, *id.* § 1681o(a). Actual damages may include not only economic damages, but also damages for humiliation and mental distress. *See, e.g.*, *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Johnson v. Dep't of Treasury, IRS*, 700 F.2d 971, 984 (5th Cir. 1983); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976), *aff'g* 383 F. Supp. 269, 276 (E.D. Mo. 1974). The statute also provides that a successful plaintiff suing under the FCRA may recover reasonable attorney's fees. 15 U.S.C.A. §§ 1681n(a)(3), 1681o(a)(2).

Equifax does not challenge the constitutionality or applicability of any of these statutory provisions. Rather, the company simply insists that, despite its numerous statutory violations, the jury erred in awarding Suzanne damages and the court erred in awarding attorney's fees. We consider each of Equifax's contentions in turn.

### III.

Equifax initially contends that the district court erred in refusing to nullify the jury verdict and grant it judgment as a matter of law. A court may award judgment as a matter of law only if it determines

that there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. Fed. R. Civ. P. 50(a). Thus, when a jury has returned its verdict, a court may grant judgment as a matter of law only if, viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, the court determines that the only conclusion a reasonable jury could have reached is one in favor of the moving party. *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002). The district court concluded that it could not so hold in this case and therefore denied Equifax's motion. We review *de novo* the grant or denial of a motion for judgment as a matter of law. *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001).

### A.

Equifax first argues that because Suzanne assertedly suffered a single, indivisible injury, she should not recover any damages from Equifax or, alternatively, her recovery should be reduced to take account of her prior settlements with other defendants. According to Equifax, the prior settlements have fully, or almost fully, compensated Suzanne for all of her injuries.

Equifax relies on the "one satisfaction rule" to support its argument. *See Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000) ("[T]his equitable doctrine operates to reduce a plaintiff's recovery from the nonsettling defendant to prevent the plaintiff from recovering twice from the same assessment of liability."). But, in the case at hand, we cannot find, as a matter of law, that Suzanne has suffered from a "single, indivisible harm" that has already been redressed by other parties. *See id.* ("The essential requirement for the 'one satisfaction rule' is that the amounts recovered by settlement and the judgment must represent common damages arising from a single, indivisible harm.").

To the contrary, Suzanne provided credible evidence that her emotional and economic damages resulted from separate acts by separate parties. She did not attempt to hold any of the credit reporting agencies responsible for damages arising from either the identity theft itself or the initial inaccuracies that the theft generated in her credit reports. Moreover, although some of Suzanne's interactions with

Equifax overlapped with exchanges with other credit reporting agencies, her encounters with Equifax both predate and postdate these other exchanges. For example, Suzanne initially contacted Equifax on February 2, 2004, more than a year before she contacted Experian and Trans Union, and Equifax's reporting errors persisted long after Trans Union and Experian had rectified the errors in their reports.

Further, during the period when Suzanne attempted to correct the mistakes made by all three agencies, each agency produced reports with different inaccuracies, and each agency either corrected or exacerbated these mistakes independently of the others. Thus, even during this period, the inaccuracies in Equifax's credit reports caused Suzanne discrete injuries independent of those caused by the other credit reporting agencies.

For all of these reasons, we reject Equifax's argument that Suzanne has suffered from a single, indivisible injury or has been doubly compensated as a consequence of her prior settlements.[2]

B.

Equifax next argues that the evidence does not support any award for economic losses. Equifax claims that only speculation and conjecture support such an award, and so the district court erred in denying Equifax's motion for judgment as to this award.

We disagree. The evidence at trial in this case clearly demonstrates that on numerous occasions Suzanne attempted to secure lines of credit from a variety of financial institutions, only to be either denied outright or offered credit on less advantageous terms that she might

---

[2]Arguably, the "one satisfaction rule" does not even apply to FCRA claims. *Cf. Ferris v. Haymore*, 967 F.2d 946, 955-58 (4th Cir. 1992) (holding that damages award against defendants under the Motor Vehicle Information and Cost Savings Act, Pub. L. No. 92-513, § 409(a), 86 Stat. 947, 963 (1972) (current version at 49 U.S.C.A. § 32710(a) (West 2007)), cannot be reduced by the amount plaintiff received in settlement from other persons participating in the violation). We need not reach this question in light of our holding that the injury caused by Equifax is divisible from the other injuries Sloane suffered.

have received absent Equifax's improper conduct. At times, these financial institutions consulted credit reports from other agencies, but at other times these institutions relied exclusively on the erroneous credit information provided by Equifax. Based on these incidents, we find that there is a legally sufficient evidentiary basis for a reasonable jury to have found that Equifax's conduct resulted in economic losses for Suzanne. Therefore, the district court did not err in denying Equifax's motion regarding this award.

## IV.

Additionally, Equifax asserts that the district court erred in refusing to order remittitur of the mental anguish, humiliation, and emotional distress damages award to no more than $25,000. *See* Fed. R. Civ. P. 59(a); *see also Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305-06 (4th Cir. 1998). Equifax contends that the jury's award of $245,000 is inconsistent with awards in similar cases and is disproportionate to any actual injury proved at trial. Suzanne, by contrast, contends that the evidence provides more than adequate support for the jury's award. To resolve this question, we set forth the relevant governing principles, apply these principles to the evidence before the jury, and compare the evidence and emotional distress award in Suzanne's case with the evidence and award in all assertedly relevant cases. Our analysis leads us to the conclusion that both Equifax and Suzanne's positions must be rejected. For reasons that we explain below, we find that the jury's emotional distress award was in fact excessive, but not to the extent that Equifax maintains.

We begin with Federal Rule of Civil Procedure 59(a), which provides that if a court concludes that a jury award of compensatory damages is excessive, it may order a new trial nisi remittitur. *See* 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2820 (2d ed. 1995). We have long recognized that the decision as to whether to grant a new trial on such grounds is "entrusted to the sound discretion of the district court and [such determinations] will be reversed on appeal only upon a showing of abuse of discretion. . . . giv[ing] the benefit of every doubt to the judgment of the trial judge." *Cline*, 144 F.3d at 305 (internal quotation marks omitted). A district court abuses its discretion only by upholding an award of damages when "the jury's verdict is against the

weight of the evidence or based on evidence which is false." *Id.* (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).

In this case, the district court found that the jury's emotional distress award was "not an unreasonable conclusion from this evidence." The court noted that the jury could base its award on Equifax's specific actions, as distinct from those of the other credit reporting agencies, and that Equifax's actions directly led to the mounting frustration and distress that Suzanne felt for almost two years. As one example of Equifax's specific actions, the court recalled the letter that Equifax sent to Suzanne, many months after she had notified Equifax of the identity theft, bearing the name of the identity thief and warning the thief, not Suzanne, that the thief's personal information was in peril. Furthermore, the district court underscored the deference accorded jury verdicts, noting that, in the present case, a jury of "ordinary people from the community," after having "listen[ed] to the evidence" and being "given proper instructions about . . . not letting passion or sympathy affect them," made a "rational decision" and returned an award of $245,000 for mental anguish, humiliation, and emotional distress. Clearly, the district court, which observed the trial witnesses first-hand, concluded that the weight of the evidence supported the amount of the jury's award.

Moreover, Equifax does not deny that Suzanne suffered emotional distress. Nor does Equifax contend that Suzanne failed to produce sufficient evidence to sustain some award for this injury. Rather, Equifax simply proposes replacing the jury's number with one of its own invention — offering $25,000 in place of $245,000. Yet when asked at oral argument to explain the basis for the proposed remittitur, Equifax's counsel could offer no legal or factual basis for this amount, conceding that the number had been taken "out of the air." Not only is such an unprincipled approach intrinsically unsound, but it also directly contravenes the Seventh Amendment, which precludes an appellate court from replacing an award of compensatory damages with one of the court's own choosing. *See Cline*, 144 F.3d at 305 n.2 (citing *Kennon v. Gilmer*, 131 U.S. 22 (1889)). In short, the issue before us is neither whether Suzanne offered sufficient evidence at trial to sustain an award for emotional distress nor whether we believe that Equifax's "out of the air" $25,000 represents a fair estimate of

those damages, but whether the jury's award is *excessive* in light of evidence presented at trial. *See id.* 144 F.3d at 305.

Our previous cases establish the type of evidence required to support an award for emotional damages. We have warned that "[n]ot only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996). For this reason, although specifically recognizing that a plaintiff's testimony can provide sufficient evidence to support an emotional distress award, we have required a plaintiff to "reasonably and sufficiently explain the circumstances of [the] injury and not resort to mere conclusory statements." *Id.* at 1251 (internal quotation marks omitted); *see also Bryant v. Aiken Reg'l Med. Ctrs, Inc.*, 333 F.3d 536, 546-47 (4th Cir. 2003); *Dennis v. Columbia Colleton Med. Ctr, Inc.*, 290 F.3d 639, 653 (4th Cir. 2002). Thus, we have distinguished between plaintiff testimony that amounts only to "conclusory statements" and plaintiff testimony that "sufficiently articulate[s]" true "demonstrable emotional distress." *Price*, 93 F.3d at 1254.

In *Knussman v. Maryland*, 272 F.3d 625 (4th Cir. 2001), we summarized the factors properly considered in determinating the potential excessiveness of an award for emotional distress. They include the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any. *Id.* at 640 (citing *Price*, 93 F.3d at 1254).

In the present case, Suzanne offered considerable objective verification of her emotional distress, chronic anxiety, and frustration during the twenty-one months that she attempted to correct Equifax's errors. First, her repeated denials of credit and continuous problems with Equifax furnish an objective and inherently reasonable "factual context" for her resulting claims of emotional distress. Suzanne also corroborated her account in two ways. She offered "sufficiently articulated" descriptions of her protracted anxiety through detailed testi-

mony of specific events and the humiliation and anger she experienced as a result of each occurrence. She also provided evidence that the distress was apparent to others, particularly her family; Tracey, for instance, described in detail his wife's ongoing struggles with Equifax and the emotional toll these events took upon her. In addition, substantial trial evidence attested to the direct "nexus" between Equifax's violations of the FCRA and Suzanne's emotional distress. Furthermore, Suzanne's emotional distress manifested itself in terms of physical symptoms, particularly insomnia.

Moreover, Suzanne offered evidence that this stress eventually came to affect her marriage to Tracey; the couple began to sleep apart and contemplate divorce. Seeking to avert this, Suzanne went to the human resources department of her employer and asked if marriage counseling were available. After receiving the name of a counselor, she begged her husband to enter counseling with her, but he refused, declaring that the problem was obviously "bad credit" and no marriage counselor, however skilled, could resolve that problem. Suzanne testified that she worried that if she and her husband separated, her poor credit history would make it exceedingly difficult for her to secure a lease in her own name or to arrange for household utilities.

Reviewing this evidence in light of the appropriate factors already set forth, we conclude that substantial, if not overwhelming, objective evidence supports an emotional distress award. Equifax ignores much of this evidence, however, and insists that an award of $245,000 is "inconsistent with awards in other similar cases." Br. of Appellant at 45. But Equifax relies on cases which are in fact not very "similar" to the case at hand and so provide little assistance in assessing the amount of the emotional distress award here.

Equifax principally looks to three employment discrimination cases in which we have ordered remittitur of emotional distress awards. But in those cases the asserted emotional distress did not "persist[ ] over time" or even affect the employee's ability to continue "to perform his job," *Cline*, 144 F.3d at 305; *Price*, 93 F.3d at 1254-55 (noting that plaintiffs offered no evidence as to how the "alleged distress manifested itself"); *Hetzel v. County of Prince William*, 89 F.3d 169, 172 (4th Cir. 1996) (noting that testimony showed plaintiff was only "briefly distraught"). Moreover, in stark contrast to the corroborated

evidence of "sufficiently articulated," true "demonstrable emotional distress" offered by Suzanne, *Price*, 93 F.3d at 1254, the plaintiffs in these cases relied almost exclusively on conclusory testimony. *See Cline*, 144 F.3d at 304-06; *Price*, 93 F.3d at 1251, 1255; *Hetzel*, 89 F.3d at 171-72.

In addition to citing these cases, Equifax also argues that several FCRA cases demonstrate that violations of the statute warrant only minimal emotional distress awards. Yet, once more, Equifax's authorities prove to be less than useful guides. One case Equifax cites hinges on the same type of conclusory testimony described above. *See Cousin v. Trans Union Corp.*, 246 F.3d 359, 370-71 (5th Cir. 2001). A second simply reflects a modest jury award based on little or no actual distress. *See Jones v. Credit Bureau of Huntington, Inc.*, 399 S.E.2d 694, 695-701 (W. Va. 1990). The remainder occurred twenty-five or more years ago and involved local credit bureaus whose inaccuracies lacked the nearly inescapable reach of the national credit reporting agencies. *See Bryant v. TRW, Inc.*, 689 F.2d 72, 75 (6th Cir. 1982); *Thompson v. San Antonio Retail Merchs. Ass'n*, 682 F.2d 509, 512 (5th Cir. 1982); *Millstone*, 528 F.2d at 834 (8th Cir. 1976).

As Equifax's authorities indicate, finding helpful precedent for comparison here is not a simple task. The recent emergence of identity theft and the rapid growth of the credit-reporting industry present a unique dilemma without clear precedent. When Congress enacted the FCRA in 1970, it recognized the vital role that credit-reporting agencies had assumed within the burgeoning culture of American consumerism. *See* Fair Credit Reporting Act, Pub. L. No. 91-508, § 602(a), 84 Stat. 1127, 1128 (1970). Since the mid-1980s, the introduction of computerized information technology and data-warehousing has led to the national consolidation of the credit-reporting industry into the "Big Three" — Equifax, Experian, and Trans Union — and rendered credit reporting an integral part of our most ordinary consumer transactions. According to recent data, each of these national credit-reporting agencies has perhaps 1.5 billion credit accounts held by approximately 190 million individuals. *See* Robert B. Avery et al., *An Overview of Consumer Data and Credit Reporting*, Fed. Res. Bull., Feb. 2003, at 49, *available at* http://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf. Each receives more than two billion items of information every month, and

together these three agencies issue approximately two million consumer credit reports each day. *Id.* at 48-49.

Against this backdrop, identity theft has emerged over the last decade as one of the fastest growing white-collar crimes in the United States. While earlier estimates placed identity theft at between 500,000 to 700,000 individuals per year, more recent random victimization surveys conducted by Synovate for the Federal Trade Commission estimate that, between 1998 and 2003, approximately 27.3 million adults discovered they were the victims of identity theft, with 9.91 million adults discovering they were victims in 2003 alone. *See* Graeme R. Newman & Megan M. NcNally, *Identity Theft Literature Review* 14 (2005), http://www.ncjrs.gov/pdffiles1/nij/grants/210459.pdf (citing Synovate, *Federal Trade Commission — Identity Theft Survey Report* 7, 12 (2003), http://www.ftc.gov/os/2003/09/synovatereport.pdf). Given the rapid emergence of identity theft in the last decade, it comes as no surprise that past precedent fails to fully reflect the unfortunate current reality.

Nonetheless, we are not wholly without help. First, there are a few, more recent FCRA cases, upon which Equifax does *not* rely, that provide assistance in this regard. Suzanne points to a recent Sixth Circuit case, *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 362-63 (6th Cir. 2005) (unpublished), in which the court upheld a jury award of $400,000 for compensatory damages in factually similar circumstances, involving protracted attempts to resolve reporting inaccuracies and repeated denials of credit. This case provides support for the $245,000 award here, but it seems to stand alone.

A survey of the other, more recent FCRA cases that involve requests for remittitur of emotional distress awards suggests that approved awards more typically range between $20,000 and $75,000. *See Zamora v. Valley Fed. Sav. & Loan Ass'n of Grand Junction*, 811 F.2d 1368, 1371 (10th Cir. 1987) (upholding a jury award of $61,500); *Cortez v. Trans Union, LLC*, No. 05-cv-05684-JF, 2007 WL 2702945, at *2 (E.D. Pa. Sept. 13, 2007) (refusing to remit a jury award of $50,000); *Boris v. Choicepoint Servs., Inc.*, 249 F. Supp. 2d 851, 860-61 (W.D. Ky. 2003) (remitting a jury award of $197,000 to $100,000, including a $75,000 award for emotional distress); *Ander-*

*son v. Conwood Co.*, 34 F. Supp. 2d 650, 656 (W.D. Tenn. 1999) (remitting a jury award of $2,000,000 to $50,000).

This handful of cases, while helpful, differs from the case at hand. For, unlike the plaintiffs in those cases, Suzanne did not suffer from isolated or accidental reporting errors. Rather, as a victim of identity theft, she suffered the systematic manipulation of her personal information, which, despite her best efforts, Equifax failed to correct over a protracted period of time. Of course, Equifax bore no responsibility for the initial theft, but the FCRA makes the company responsible for taking reasonable steps to correct Suzanne's credit report once she brought the theft to the company's attention; this Equifax utterly failed to do. A reasonable jury could conclude that Equifax's repeated errors engendered more emotional distress than that found in these other FCRA cases.

We also believe that some guidance can be gained from case law concerning defamation. Prior to the enactment of the FCRA, defamation was one of several common-law actions used by plaintiffs in response to the dissemination of inaccurate credit information.[3] These common-law causes of action parallel those offered under the FCRA in that they typically involve a defendant found liable for propagating inaccurate information about the plaintiff, and the effects, while unquestionably harmful, are difficult to translate into monetary terms. Moreover, unlike many of the employment discrimination claims cited by Equifax, both defamation and FCRA cases usually contain a crucial objective dimension — the extent of the false information

---

[3]A provision of the FCRA bars consumers from bringing actions "in the nature of defamation, invasion of privacy, or negligence" in certain specified contexts, except as those causes of action arise under sections 1681n and 1681o of the FCRA. 15 U.S.C.A. § 1681h(e). *But see Yutesler v. Sears Roebuck & Co.*, 263 F. Supp. 2d 1209, 1212 (D. Minn. 2003) (finding the plaintiff's common-law defamation claim not preempted by the FCRA); *Carlson v. Trans Union, LLC*, 259 F. Supp. 2d 517, 521-22 (N.D. Tex. 2003) (same); *Dornhecker v. Ameritech Corp.*, 99 F. Supp. 2d 918, 930-31 (N.D. Ill. 2000) (same); *see also* Tracy Bateman Farrell, *Preemption of State Law by Fair Credit Reporting Act*, 8 A.L.R. Fed. 2d 233, §§ 10-12, 16-17 (2006) (summarizing case law finding no preemption by the FCRA).

communicated about an individual — that provides some external measure to the otherwise subjective question of emotional distress. Although such determinations depend a great deal upon the specific facts of each case, courts frequently sustain emotional distress awards in the range of $250,000 in defamation cases. *See, e.g.*, *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 439 (4th Cir. 2004) (upholding an award of $240,000 for "insult, pain, and mental suffering"); *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304, 1319-20 (11th Cir. 1990) (upholding an award of $250,000, given that the slander caused "an impairment of [the plaintiff's] reputation, personal humiliation, and mental anguish and suffering").[4]

We do not believe the evidence presented here permits an award of this magnitude because, after all, this case does not involve actual defamation. Moreover, Suzanne presented almost no evidence at trial to suggest that Equifax's violations of the FCRA resulted in harm to her reputation, and it appears that few people beyond Suzanne's family and potential creditors knew of her disastrous credit file. We therefore believe that the maximum award supported by the evidence here must be significantly less than these defamation awards. But, considering the extensive corroboration offered at trial concerning the many months of emotional distress, mental anguish, and humiliation suffered by Suzanne, we believe that the evidence does support an award in the maximum amount of $150,000. We recognize that even this amount is appreciably more than that awarded for emotional distress in most other FCRA cases.[5] But, as explained earlier, the case at hand

---

[4]We recognize that, in cases that involve physical injuries, states that limit recovery for non-economic losses typically set a cap between $250,000 and $500,000, *see, e.g.*, Cal. Civ. Code § 3333.2 (West 2007) (limiting non-economic losses to $250,000); Kan. Civ. Proc. Code Ann. § 60-19a02 (West 2006) (limiting recovery for pain and suffering in a personal injury action to $250,000), with a handful of states setting the limit at $750,000 or more, *see, e.g.*, 735 Ill. Comp. Stat. Ann. 5/2-1706.5 (West 2007) (limiting non-economic damages for medical malpractice claims to $1,000,000). Even though such non-economic harms often go far beyond emotional distress to include awards for pain and suffering and loss of consortium, these statutory caps do suggest the boundaries that state legislatures have adopted regarding monetary awards for intangible harms and, a fortiori, emotional distress.

[5]The single exception is *Bach*. 149 Fed. Appx. at 362-63. As explained within, we regard the $400,000 award in that case an anomaly.

differs significantly from those cases. A $150,000 award reflects those differences — the repeated violations of the FCRA found by the jury in its special verdict, the number of errors contained in Equifax's credit reports, and the protracted length of time during which Equifax failed to correct Suzanne's credit file. Accordingly, we reduce the emotional distress award to $150,000 and grant a new trial nisi remittitur at Suzanne's option.

V.

Finally, Equifax challenges the district court's order regarding attorney's fees. At a post-trial hearing, the district court denied Equifax's express request to submit a written opposition to Suzanne's motion for attorney's fees. Instead, after brief oral arguments, the district court granted Suzanne's motion for attorney's fees in the entire amount requested — $181,083.

At the time of the hearing, Federal Rule of Civil Procedure 54(d)(2)(C) provided that "[o]n request of a party or class member, the court shall afford an opportunity for adversary submissions with respect to the motion in accordance with Rule 43(e) or Rule 78." Fed. R. Civ. P. 54(d)(2)(C)(2006)(amended April 30, 2007, effective December 1, 2007). Prior to the hearing, Equifax believed that it would have an opportunity to submit a written opposition, and it repeatedly requested such an opportunity during the fees hearing. The language of Rule 54(d)(2)(C) was not discretionary; Equifax should have been allowed to submit materials to the district court. Accordingly, we vacate the grant of attorney's fees and remand the case to the district court to permit Equifax such an opportunity.

VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.*